Lewis Curtis and George Griswold, Trustees of the Appalachicola Land Company, Appellants, *v.* John and James Innerarity.

Where there was a sale of wild lands in Florida, occupied by Indians, and the purchasers gave a mortgage to secure the payment of some outsanding instalments of the purchase money, the fact that the purchasers had not complete possession of the lands is not a sufficient objection to their being charged with interest from the time when the money was due.

They had paid a large part of the purchase-money before the execution of the mortgage, without raising this objection, and the parties to the contract of sale knew that the Indians had possession of the lands as hunting-grounds.

The purchasers in a former suit averred that they had peaceable possession, and the vendors cannot be held responsible for a subsequent disturbance.

The doctrine of the civil law, viz. "that the vendee is not liable for interest where he received no profits from the thing purchased," applies only to executory contracts where the price is contracted to be paid at some future day, and the contract is silent as to interest.

Nor is it an objection to the allowance of interest, that the purchaser was put to much trouble and expense to obtain a recognition of his title.

The claim to be released from interest, upon the ground that there was no person legally authorized to receive it, is not supported by the facts in this case.

Where the vendor gave a power of attorney to an agent to receive a payment from the purchasers on account, and the agent gave a receipt in full for certain balances by way of adjustment and compromise, and the vendor disapproved of the acts of the agent, the payment is not good, even on account, against the vendor.

The purchasers, by making a payment in this way, upon certain terms which were not within the power of attorney, constituted the agent their agent. For two years afterwards, they insisted upon the binding force of the acts of the agent to the extent to which he had given releases, and only claimed the payment to be on account when the agent became insolvent. It was then too late.

THIS was an appeal from the Court of Appeals for the Territory of Florida.

All the material facts in the case are set forth in the opinion of the court.

The case was argued at the preceding term by *Mr. Webster* and *Mr. Berrien*, for the appellants, and by *Mr. Westcott* and *Mr. Jones*, for the appellees.

*Mr. Webster* opened the case, on the part of the appellants, by stating all the circumstances of it. He then contended that the appellants were not properly chargeable with interest during the interval between the death of John Forbes in 1822, in Cuba, and there being a personal representative of his estate in the United States. There was nobody to whom a payment could rightfully have been made. Moreover, the purchasers did not come into possession until 1835, when a decree of this court confirmed their title. Previously to that, both the commissioners and courts in Florida had rejected it. By the rules of the civil and Spanish law, the land when sold was warranted, and when this is the case, and the purchaser cannot get possession, no interest is payable. 1 Domat, 399, §§ 3, 4, 5, 75, 76, 79; 2 Wash. C. C. 204.

Under such circumstances, if notes are given for the purchase, chancery will restrain the vendor from collecting the notes until the encumbrances are cleared away. Of course, interest would not run during this time. 2 Johns. Ch. R. 546; Colin Mitchell's case, 9 Peters, 711.

We are entitled to a credit for the money paid to Blount under his power of attorney. The power was ample to receive money. If he went beyond it, it is an affair between his principal and himself. But the power extended to the receipt of the money which we paid. If what he did beyond his power can be separated from what he did within it, then the latter is good *pro tanto*. If it cannot be separated, perhaps the whole act is void. It is for the court to say whether the payment on our part of a specific sum of money cannot be distinguished from the releases which he gave. Story on Agency, 204, § 170.

If he had power to receive money on behalf of the mortgagee, he had power also to state an account and to give a receipt. So far his acts must be good, because a line can be drawn between them and his other acts.

*Mr. Westcott*, for the appellees, said that some of the facts stated by the opposite counsel did not appear upon the record. He therefore recapitulated the circumstances of the case as they were exhibited by the record. The instalments were all payable in London according to the contract, and in deciding that they were not, the court below erred, for the acts of the parties and the terms of the contract showed the contrary The mortgage was made in consequence of a settlement between Forbes and Mitchell for money then due. All prior payments were presumed to be adjusted and taken into the account. It was given for the last two instalments, and the

time extended. The interest upon this extension would amount to a large sum, and the parties must be presumed to have had it in their minds. But it is said that we are not entitled to interest, because the contract was executed in Florida, and by the civil law no interest accrues until the vendee is placed in possession. Also, because there was no person legally authorized to receive the interest. With regard to the first point, where is the evidence, in this record, of any difficulty in obtaining possession? The record of a former case tried in this court shows that these parties then said they had been in undisturbed possession. The petitioners in that case were the assignees of Colin Mitchell.

It is said, also, that by the civil law a sale implies a warranty, and Domat is cited. But Domat does not give the laws of Spain which prevailed in Florida. It might be admitted that the civil law implies a warranty where there is a sale of personal property. But it is not the rule as to sales of property where deeds are required. The French law is not the same with the Spanish. For example, Domat says it is not necessary that the vendee must be ousted, to entitle him to bring an action against the vendor. This may, perhaps, have been Roman law, but it is not Spanish. Johnson's Laws of Spain, 216, 217.; in brackets, 195.

The Spaniards seem to have derived their law from the same source from which the common law of England came. In both, there must be an actual eviction. But in this case, the appellants say that they were disturbed in their possession by the United States, when the decision of this court shows that the United States had no title.

The contract is said to have been for the purchase and sale of wild lands which yielded no fruits. 1 Domat, book 3, sec. 14; p. 422, enumerates four classes of cases where interest is chargeable. One is when it depends on the agreement. It is true that in our case nothing is expressly said about interest, either in the contract or mortgage. But the intention of the parties must be the guide, and that can be gathered from the contract. The civil and common law agree in this. If the time of payment was fixed by the mortgage, new security taken and the time extended, these circumstances take the case out of the rule respecting wild lands, because they supervene upon the original contract. It was executed after the treaty with Spain was concluded. The change of flags took place in July, 1821. But in February, 1820, it was known that a treaty was concluded. Mitchell's purchase was in anticipation of the treaty. Is it a case, then, to be governed by the civil law, contrary to the intention of the parties and to the equity of the

case ? The court below allowed five per cent. interest. But in August, 1822, the laws of Florida (p. 48) gave six per cent. The case cited from Wash. C. C. Rep. 250 is not in point. I refer to the same book, p. 253. On the general subject of interest, all the cases are cited in 2 Fonblanque, 423 ; in brackets, 425.

But another reason given for not being charged with interest is, that there was no person authorized to receive the money. It is true that Forbes had no administrator in Florida until 1837 ; but he had an executor in Havana, and the contract was made there. The law is, that the party must show that he was willing and ready to pay before he can be excused. 3 Leigh, 619 ; Powell on Mortg. 367, 368 ; 2 Tomlins's Law Dict. 247 ; 1 Ves. 222 ; Burge's Com. 754.

In the record, the appellants admit their liability to pay interest, and in the settlement with Forbes they actually pay five per cent. interest. If they put it upon the ground of a tender, we reply that a tender must be strictly made, so that the tender of a less sum is no bar to interest. Powell on Mort. above ; 3 Kent's Com. 450 ; 6 Randolph, 465.

Payments must first be applied to interest. 1 Halsted, 408 ; 1 Dall. 124.

As to Blount's power of attorney, he had only authority to receive money on account. He is prohibited in six different places from giving a release in full. Such powers must be strictly construed. Story on Agency, 63.

The appellants knew that we claimed $57,000, and yet took a release in full for $13,000. What did good faith require of them ? Certainly, to notify Innerarity ; and yet, although the money was paid in October, 1839, he did not know it until May, 1840. As soon as he knew it, he disavowed it. The appellants purposely concealed it. (*Mr. Westcott* here examined many parts of the record to show this.)

With respect to the number of instalments of £375 each which ought to be deducted, the appellants never claimed more than one in their answer, and yet the court allowed them two.

*Mr. Jones*, on the same side, said that most of the original parties were dead. The affirmative of the questions raised had to be proved by the appellants. They were sued below on a plain question of mortgage, and ought to have presented their defence long ago. Persons and documents were then existing, to clear up things which are now dark. The contract was made in 1817 between Forbes and Mitchell, both residing in the same jurisdiction. The first instalment was provided for, leaving a balance of $50,000. Two years afterwards, a mort-

13*

gage was made, and now the appellants wish to go behind the
contract and mortgage too.    Their claim is against strong pre-
sumption, and requires strict proof.

*Mr. Berrien,* in reply and conclusion, said that the evidence
in the cause is very defective ; but it is not the fault of the
appellants.    It is owing to the prosecution of a stale demand
by the other side, after the evidence to resist it has in a great
degree perished.    The pleadings, also, are very irregular, and
the record is strangely arranged ; but the questions at issue can
be discovered and fairly represented.    The bill of Innerarity to
foreclose, the answer of Curtis, the amended bill of John In-
nerarity, and the answer to it, are sufficient, without the pro-
ceedings upon the cross-bill, to make the questions intelligible.
These proceedings show that it is a bill to foreclose a mort-
gage by John Innerarity, as the administrator of Forbes, claim-
ing $76,000 ; this claim is then reduced to $67,000, and sub-
sequently to $28,000.    In this last, we say there is error in the
following points, and that the decree ought to be reversed : —

1st.  Because interest is calculated on each instalment from
the respective days of payment, when it ought only to have
been allowed from the time of the demand made by filing the
bill of foreclosure, or, at most, from the grant of letters of ad-
ministration on the estate of John Forbes to John Innerarity,
one of the complainants.

2d.  Because the balance alleged to be due on an unpaid bill
of exchange, given by Colin Mitchell, which was not secured
by the mortgage, together with damages and interest, are al-
lowed in the decree.

3d.  Because the court refused to allow a deduction of £ 375
to be made from the amount due on the mortgage, notwith-
standing the written acknowledgment of John Forbes that
such deduction should be made.

4th.  Because the court refused to allow, as a payment on
the mortgage, the sum of thirteen thousand three hundred and
fifty-seven dollars and seventy-three cents, received from the
appellants by Thomas M. Blount, the agent and attorney of
John Innerarity.

5th.  Because costs are decreed against the appellants.

The date of the letters of administration is not in the rec-
ord, but it must have been between 1835 and 1837.

1.  Interest upon the two instalments.

The condition of the property was and is notorious.    It was
wild land, inhabited by Indians, and the record shows it.    In
the former case, which has been referred to, it is true that there
was an averment that the parties had been in undisputed pos-

session, but it was inserted merely to give the court jurisdiction, and is contradicted by the evidence. The Indians were quiet whilst the Spanish government lasted, but became turbulent as soon as the change took place. The purchasers could not get possession of the property. By the civil law, interest is not payable, although a term be fixed for payment, which term has expired, unless the purchaser is put into possession, or the thing purchased is capable of producing fruits. 1 Domat, p. 397, 2d ed., tit. 5, sec. 1, art. 3.

The Spanish law must govern the case. But the same doctrine is maintained in our country. 2 Wash. C. C. Rep. 253.

In Domat, p. 398, art. 5, it is said that if the cause produces no revenue, interest is due only where there is a demand. This court will officially take notice of acts of Congress and treaties, and these prohibit any exercise of ownership by claimants until the title is settled. It has been said that there was no warranty in the deed. But by the civil law a warranty is implied. 1 Domat, p. 75, tit. 2, sec. 10 ; ibid. p. 76.

By our own law, any disturbance would be a ground for an injunction to stay the collection of the purchase-money. 2 Johns. Ch. R. 546.

Interest is given for money which is due and payable. But if it is not payable, according to the above case in Johnson, then no interest can be charged.

In the next place, terest cannot be claimed because from 1822 to the grant of letters of administration (say in 1837) there was no person legally entitled to receive a payment or to release the mortgage. Forbes's executor in Cuba must be excepted from this remark ; but an offer of payment was made to that executor and refused. The refusal is alleged in the bill, and admitted in the answer. How can the debtor be charged with interest, when, if he sought to pay his debt, there was no one to whom he could pay it who could give him a legal receipt ? It is said that the debtor must give notice to the creditor that he had the money ready. But in the cases referred to, there was some person authorized to receive such a notice ; but here there was not. It is also said that we did pay interest, and therefore acknowledged our liability to pay. It is true that interest was paid, but by whom, and when ? It was only when letters were taken out, and was not paid by the mortgagor, but by the drawer of a bill of exchange, — by Colin Mitchell ; the mortgagor never paid any, and Colin Mitchell had no legal title. If interest is due, therefore, it can only be due from 1837.

2d point. As to the bill of exchange.

The bill was not produced in the court below, but the court

say that payment was made by the parties. But the payment was made by Colin Mitchell, and not the parties in the case. The judge therefore erred in a matter of fact. Payment of the bill could not have been enforced in a suit to foreclose the mortgage. It was given for the first instalment due upon the mortgage, and must have been received either as payment or as collateral security. If as payment, then a lesser security than the mortgage has been accepted, and it is just as if we had paid in cash. If it was taken as collateral security, the bill should have been returned when not paid. Under a bill to foreclose the mortgage, it is impossible to collect damages on a protested bill of exchange. They should have sued the drawer, Colin Mitchell, at law upon the bill.

3d point. As to the £375.

The court below say that we claim two allowances of £375, whereas we formerly claimed only one.

(*Mr. Berrien* here entered into many calculations upon this matter.)

4th point. As to Blount's authority.

The true rule upon this subject has been quoted by Mr. Webster from Story on Agency, §§ 166, 170. Where the acts of the agent within his authority are distinguishable from those beyond it, the former are good, and the latter only are void.

We say, 1st. That the authority was substantially executed.

2d. That the acts within the power are distinguishable from those beyond it.

The power which Blount had necessarily included a power to state an account and show what balance was due ; and the receipt of $ 13,000 was clearly within the scope of his authority. The court below say that the payment was clogged with a condition which Innerarity could not accept, and therefore he was not bound to bear the loss. But there is nothing in the record to sustain this. Blount was president of a bank, was Innerarity's solicitor in the case, and his bosom friend. Innerarity says he did not know of this transaction until 1840, and the counsel on the other side complain that we were guilty of a fraud in not giving notice. But why should we give notice ? The presumption was that the agent would report to his principal. We paid the money, and took a receipt. It was not our duty to give notice of it to the principal.

Mr. Justice GRIER delivered the opinion of the court.

It would contribute nothing to a clear apprehension of the merits of this case to enumerate the various bills, answers, cross-bills, &c., constituting the very voluminous and confused

mass of pleadings and documents spread upon our paper books. The pleadings have been consolidated, by agreement of the parties. We may, therefore, consider the case before us as a bill by John Innerarity, administrator of the estate of John Forbes, deceased, against the trustees of the Appalachicola Land Company, for the foreclosure of a mortgage given under the following circumstances.

On the 4th of December, 1818, John Forbes, acting as the executor of William Panton and Thomas Forbes, and as agent of their respective heirs, covenanted to sell to Colin Mitchell "two undivided thirds of a certain tract of land ceded by the Creek Indians unto the house of trade of which said Forbes was the principal partner, lying upon and between the rivers Appalachicola and Appalachee, and containing about one million two hundred thousand acres, for the consideration of $66,666.66, to be paid in the following manner: — One fourth, or $16,666, on the 1st of May next, in the city of London, valuing the same at four shillings and six pence sterling each dollar; the remainder, or $50,000, in four equal yearly instalments, reckoning from the date," &c.

This agreement was made and executed in the island of Cuba, where John Forbes then resided. Colin Mitchell purchased for himself, Carnochan, and others, and subsequently took the title in his own name, and continued to hold it till 1820, when he transferred it to Octavius Mitchell, who held it as trustee for the company then or afterwards known as the Appalachicola Land Company. On the 9th of October, 1820, Octavius Mitchell executed a mortgage to John Forbes for the last two instalments of $12,500 each, due, by the agreement, on the 8th of December, 1820, and the 8th of December, 1821; but further time appears to have been given in the mortgage for these two payments, as they are made payable on the 9th of March, 1821, and the 9th of March, 1822. This mortgage is on the undivided half of the land conveyed to Mitchell, and is the subject of the present suit.

John Forbes, the mortgagee, died in Cuba, in May, 1822, having made a will and appointed executors, who qualified and acted as such in that place, but never proved the will nor obtained letters testamentary in Florida.

John Innerarity first obtained letters of administration in Florida, on the estate of John Forbes, on the 5th of July, 1836.

That there is a balance due and unpaid on this mortgage seems to be admitted; but the parties differ widely in their estimates of its amount. The Superior Court for the county of Escambia, where this case originated, adjudged the balance

due on the mortgage to be $50,159.60. On appeal to the Court of Errors of the territory, that court decreed the balance due to be $28,500. From that decree both parties have appealed. At present, we can notice only the exceptions taken by the mortgagors, whose appeal is now under consideration.

They have insisted on three several exceptions to the decree of the Court of Appeals, which will be noticed in their order.

1. Because interest was allowed from the time the money secured by the mortgage became payable, when it should have been allowed only from the time of filing the bill for foreclosure.

2. Because the court refused to allow a credit of £375, which John Forbes admitted should be deducted from the amount claimed.

3. Because a payment of $13,357.73, made to Thomas M. Blount, was not allowed as a credit.

We shall consider these exceptions in their order, stating the facts of the case bearing on each of them so far as may be necessary to their elucidation.

I. As to the interest.

As the contract for the purchase of these lands, and the mortgage given to secure the balance of the purchase-money, were executed in the island of Cuba, the court below allowed the current and legal rate of interest of that place (five per cent.) from the time the respective payments became due.

It is a dictate of natural justice, and the law of every civilized country, that a man is bound in equity, not only to perform his engagements, but also to repair all the damages that accrue naturally from their breach. Hence, every nation, whether governed by the civil or common law, has established a certain common measure of reparation for the detention of money not paid according to contract, which is usually calculated at a certain and legal rate of interest. Every one who contracts to pay money on a certain day knows, that, if he fails to fulfil his contract, he must pay the established rate of interest as damages for his non-performance. Hence it may correctly be said, that such is the implied contract of the parties. (See 2 Fonblanque, Eq. 423. 1 Domat, book 3, tit. 5.) The appellants themselves seem to have been fully aware of the justice of this rule, as in all their communications with the mortgagees they have admitted their liability to pay interest, and in their bill, filed in 1837, to have satisfaction entered on the mortgage (which makes a part of the record of this case), they offer "to pay interest at five per cent. from the 8th of December, 1821." This may not of itself be a sufficient rea-

son for disallowing their present exception, if founded in jus-
tice, but it affords a strong presumption that it has no such
foundation.

The reasons alleged in support of this exception are, first,
that the mortgagors had not possession of the land, or at
least received no profits from it, and that, in either case, by the
civil law, the purchaser is not bound to pay interest. But we
are of opinion that this objection is founded on a mistake both
of the law and the fact. The mortgage was given more than
two years after the sale to the mortgagors and title executed to
them. A large portion of the purchase-money had been paid,
and no objection made, that the purchasers had not all the pos-
session of which the land was capable. Both parties knew
that, although the Indians had ceded their title, they still con-
tinued a transient occupancy of the lands for hunting-grounds.
They may have infested the lands, and rendered it dangerous
for the owner to occupy them in time of war; but their pos-
session was not what the law would term adverse, not being
with claim of title. There was no covenant by the vendor to
expel or exterminate the Indians; the purchasers received such
possession of the land as could be given them, *cum onere*. It
was not expected that the Indians should attorn to them or pay
them rent. The purchasers of over a million of acres of wild
lands did not expect to make profits by actual cultivation or
reception of rents. Their expectation of profit was from the
increase in value of the lands from efflux of time and the prog-
ress of improvement. These profits they have realized, doubt-
less to the amount of more than a thousand per cent. on their
original investment. Moreover, the record of the Forbes case,
decided in this court (and read in evidence in this case, by con-
sent), shows that, in 1828, eleven years after the purchase, the
appellants, or those under whom they claim, declared under
oath that they had had "peaceable possession" of the land ever
since their purchase. If, since that time, or before it, an actual
*pedis possessio* of these lands may have proved difficult or
dangerous, owing to Indian wars, it surely cannot be seriously
argued, that any warranty, expressed or implied, either by the
civil or the common law, makes the vendor liable for the acts
of a public enemy, or for a detention or disturbance of the pos-
session by the act of the sovereign power. The purchasers
have received full seizin and possession of these lands in the
year 1819, under a title proved to be good and indefeasible;
the execution of this mortgage is an assertion of the fact; they
have neglected to comply with their contract to pay the money
secured by the mortgage for ten years, at least, without any
apology; and it would be a strange doctrine indeed, and one

equally unknown to the civil as to the common law, that an accidental disturbance of the possession by the public enemy, happening so many years after such default of payment, could retroact to justify its previous detention, or operate as a defence to the payment either of principal or interest.

Besides, if it were true that, during all this time, the vendee was unable to have such a possession of his land as to receive profits from it, the doctrine of the civil law, as quoted by the learned counsel for the appellant, — "that the vendee is not liable for interest where he received no profits from the thing purchased," — has no application to the present case. It applies only to executory contracts, where the price is contracted to be paid at some future day, and the contract is silent as to interest. In such a case, the civil law will allow interest from the date of the contract of sale, if the vendee has had possession and received profits from the thing purchased. In this it differs from the common law, which would not allow interest before the day fixed for payment, unless specially contracted for. But where the purchaser has contracted to pay on a given day, and neglects or refuses so to do, both law and equity subject him to interest as the measure of damages for the breach of his contract.

A second objection made to the payment of interest is, that the purchasers incurred much trouble and expense in obtaining any acknowledgment of their title from the United States, and, although it was finally decided by the Supreme Court of the United States that their title was valid, yet that the courts of Florida had declared it invalid, and thus caused a cloud to hang over it for two or three years, which hindered the settlement, improvement, and sale of the lands.

It is hard to conceive on what grounds these facts should constitute a defence to the payment of interest. The vendor *did* not, and no sane vendor *would*, covenant that his vendee should enjoy the property in all future time, free from unjust interruption or oppression either by the sovereign power of the State, the public enemy, or individual trespassers. At the time this company purchased this claim from Forbes, the United States and Spain were in treaty for the cession of Florida; and doubtless it was the prospect of this change of sovereign, and the anticipated increase in value in consequence thereof, that moved them to purchase this large claim on speculation, and to covenant to pay the money for it, without waiting to see whether the United States would confirm the title, or without exacting from the vendors any covenant for the payment of any expenses to be incurred in obtaining the confirmation of their title by the new sovereign.

It may be admitted, also, that a court of equity would have enjoined the vendor from enforcing the collection of the purchase-money while the decree of the Florida court as to the title remained unreversed, from an apprehension of a total failure of consideration; yet as that judgment *was* reversed, and as the vendee was never evicted or put out of possession, he could have no claim to be released from paying interest, even during the time his title was thus unjustly subject to a cloud, much less for any term preceding its existence, or since its removal. As we have already said, there was no covenant in this sale, nor is there in this or in any sale, either of real or personal property, any implied warranty by the vendor that his vendee shall enjoy it for ever free from all unjust or illegal interference either by the sovereign, or the citizen, or the public enemy.

If the money secured by this mortgage had been paid when it became due, the mortgagee could have retained it with good conscience, and the mortgagor could have shown no right to recover it back on the ground of failure of consideration; for the consideration has not failed, and the title to the lands sold is indefeasible. And such being the case, it is hard to perceive any reason why the mortgagor should not be liable to the legal damages for detaining money which he was bound to pay.

Another reason urged against the allowance of interest in this case is founded on the allegation, that, from the death of Forbes, in 1822, till 1836, when John Innerarity took out letters of administration in Florida, there was no person to whom the mortgagors could legally make payment. But this argument is founded on a mistake of facts, as it appears clearly by the record, that, whenever the mortgagors were ready or willing to pay, they found persons ready to receive and give them a good and sufficient acquittance.

John Forbes was a trustee, as to this money, for the heirs of Panton and Thomas Forbes. When the mortgagors called on the executors of John Forbes to make a partial payment on the mortgage, they declined to receive it, but directed the payment to be made to the *cestui que trusts*, which was accordingly done. In October, 1823, one half of the first instalment was paid to William H. Forbes, acting for himself and the other heirs of Thomas Forbes. In the same year, also, the mortgagors paid to James Innerarity, who represented the heirs of Panton, the sum of $ 2,680.81, and in February, 1825, the further sum of $ 2,080.87. There is no evidence of any tender of the balance, either to the executors of Forbes or to the *cestui que trusts*.

This objection is therefore without foundation; and this

exception to the decree of the Court of Appeals is over-ruled.

II. The second exception is to the refusal of the court to allow a credit of £ 375, claimed by the mortgagors.

After three of the five instalments into which the price of the lands was divided had been paid, but before the execution of the mortgage to secure the last two, it was discovered that John and James Innerarity, who were owners of one fifth of the Panton interest (or one tenth of the two thirds sold), would not assent to the sale made by John Forbes. Whereupon, as appears by all the testimony and the admissions of the parties, it was agreed to refund to the purchasers a proportional amount (being one tenth) of the purchase-money. Accordingly, three several sums of £ 375 were refunded to John Carnochan, who then represented the purchasers. "Besides which," says Forbes, in his letter of 10th of December, 1819, "you will have to deduct from the acceptances due in 1820 and 1821 *two* similar sums at these distinct periods." On the trial below, the mortgagees insisted, that, as the mortgage was given for the balance due on the purchase nearly a year after the above-stated letter of Forbes, the fair presumption would be, that all the deductions for the defect of title in the Panton share had been already made, as the parties were fully aware of the difficulty, and had already refunded large sums on account of it; and, as further time was given in the mortgage for the payment of the last two instalments, it would not be probable that the parties had inadvertently given a security for a larger sum than was due. On the contrary, the mortgagors contended that they were entitled to a credit for two sums of £375, according to the admission in Forbes's letter. The Court of Appeals allowed them a credit for one sum of £375, but refused to allow the other; which constitutes the ground of the second exception to the decree.

As the correctness of the position taken by either party, on this point, can be subjected to the test of mathematical calculation based on admitted facts, we are of opinion that this exception has not been sustained. The whole amount of purchase-money for the two thirds conveyed was £15,000 sterling. The deduction for the Innerarity interest was one tenth, or £1,500, which would make *four* instalments of £375 each. As the mortgage is given for the last two instalments without any deduction, and as it is admitted that three instalments of £375 each were refunded, it is plain that the fourth sum of £375 was not deducted from the mortgage, and equally plain that John Forbes was mistaken when he said that *two* sums of £375 remained yet to be deducted. The origin of this

mistake can easily be discerned. The first payment was one fourth of the whole purchase-money, or £3,750; the one tenth refunded was £375; but as the remaining three fourths were divided into *four* instalments, each of £2,812 10s., the deduction from each would be but £281 5s. He overlooked the fact, that the last four instalments, being each one fourth less than the first, the amount to be deducted would be diminished in the same ratio. The oversight or mistake of Forbes in 1819 is not greater than that of both parties in 1820, when they included in the mortgage £375 which they knew was not due. But as the fact is fully established, that the only subject of deduction was one tenth of the whole, and that three sums of £375 had been refunded, and no more, the admission of Forbes, on the one side, and the presumptions of fact drawn from the execution of the mortgage, on the other, must both yield to the certainty of arithmetic.

III. The third and last ground of exception urged by the appellants is the refusal of the court to allow them a credit for the sum of $ 13,357.75, paid to Thomas M. Blount, the agent and attorney of John Innerarity.

Some two years after the commencement of the litigation between these parties, the appellants made a payment to Thomas M. Blount of $ 13,357.75, under the following circumstances.

It was admitted by both parties that a large sum was due on the mortgage, but they differed widely as to the amount. Innerarity, being willing to receive any amount which the mortgagors were willing to pay, and give them a general credit for so much paid on account, without compromitting his right to recover the whole amount claimed by him, gave a power of attorney to Thomas M. Blount, who was going to New York, where the appellants resided, "to receive from the trustees of the Appalachicola Land Company, in the city of New York, any sum or sums of money on account of and in part payment of the mortgage, &c., and to give such receipt or receipts, release or releases, therefor, as may be deemed requisite to exonerate the said trustees from so much of the said mortgage as may be paid by them on account and in part payment," &c., &c.

With this power of attorney, Blount proceeded to New York, and, instead of receiving such sums as the mortgagees might choose to pay on account, and giving such receipts or releases as he was authorized to give, he assumed to adjust and settle with the company the whole balance due on the mortgage, and to act as if he had been authorized to arbitrate and decide all the matters in variance between the parties, in the controversies then pending in the courts of Florida. For the sum of $ 4,832.35, he gave the mortgagors a discharge for the balance

of the first instalment, including the disputed item of damages on the bill of exchange, claims, &c. And for a further sum of $ 8,525.38 he gave a discharge of one half the last instalment. Both Blount and the appellants well knew that Innerarity had uniformly and tenaciously claimed a much larger amount as due on each of these items; and they ought to have known, that, even if no more was justly due on them than the amounts paid, Blount had no authority to compromise or adjudicate on the justice of Innerarity's claim. Besides these sums of money which are stated in Blount's release to be the whole consideration thereof, he received also a written contract of Messrs. Curtis and Griswold, to pay a further sum of $ 5,000, on certain conditions; but to whom, or how, or on what contingency, it is difficult to discover from any thing that appears on the face of the paper, or the evidence in the cause.

. Soon after this transaction (on 20th January, 1840), Innerarity gave notice by letter to the appellants, that he repudiated the act of Blount, and says : — " So soon after his return as I saw Mr. Blount, *he informed me of the provisional arrangement that he had made with you, subject to my approval.* But this involved the suspension of the sum of $ 5,000, with the corresponding interest, &c., for which your contingent bond was proposed, &c., with the preliminary, however, of the cancellation of the moiety of the mortgage. This proposition, I confess, startled me," &c.

The appellants, though thus informed by Innerarity that he considered " Blount as placed in the position of their agent," and that he was unwilling to ratify " this provisional arrangement," nevertheless proceeded to put on record in Florida the release given them by Blount. When this came to the knowledge of Innerarity, he again addressed them, by letter of 19th May, 1840, as follows : — " I addressed you a letter on the 20th of January last, and subsequently on the 25th of February, by original and duplicate, in which I advised you, that, having learned from T. M. Blount that he had an arrangement with you subject to my approval, as he stated to me and others, in relation to a discharge of one moiety of the mortgage, &c., I did not feel at liberty, as the representative of the interest of others, for the reasons stated in my said letter of 20th of January, to sanction the provisional contract which he made. To these letters I have received no answer, but to my great astonishment have just seen the deed of release given to you on the 19th of September, by Mr. Blount, in which he proposes to act as my attorney, and which deed professes to discharge the trustees from one moiety secured by the above-

mentioned mortgage. In so doing Mr. Blount has transcended his authority as my attorney, as will appear by reference to my letter of attorney, &c., &c. Feeling it to be my duty to disavow this unauthorized assumption of my attorney, and not less my duty to give you timely warning to protect yourselves from injury, I hereby notify you that I disavow and repudiate the deed of release, &c. I have not received, nor will not receive, any part of the money paid by you to Mr. Blount; but will look to you and the original security for the debt due under the said mortgage."

The receipt of these letters is admitted by the appellants in their answer to a supplemental bill filed by Innerarity (June 12th, 1840), for the purpose of having Blount's release delivered up, and the whole transaction between him and the trustees declared fraudulent and void. On the 6th of July, 1840, Carnochan, one of the trustees, filed his cross bill to make Blount a party, and praying that, inasmuch as the money paid to him by the trustees had not been applied to the purpose for which it was designed, it may be paid into court and held under their control. On the 9th of April, 1841, the appellants filed another cross bill, insisting on the full power of Blount in the transaction, and praying the court to confirm and establish the release, and to order satisfaction to be entered on the mortgage accordingly.

And finally, on the 27th of June, 1841, after it was ascertained that Blount and the Bank of Pensacola (of which he was president, and in which he had deposited the money) were both insolvent, and that the money paid to him was lost, the appellants, in their answer to the cross bill, *for the first time*, offer " to waive the said release," and " be satisfied that payment shall be held and regarded as on account of the mortgage generally, and be credited *pro tanto*."

On these facts, the appellants contend that they are entitled to a credit for the money paid to Blount, because he was authorized to receive it; and although the settlement he made and the release he gave may be void for want of authority, yet his acts, so far as they were authorized, were valid and binding on his principal.

" Regularly it is true," says Lord Coke, " that when a man doth less than the commandment or authority committed unto him, then, the commandment or authority being not pursued, the act is void. And when a man doth that which he is authorized to do, *and more*, then it is good for that which is warranted, and void for the rest. Yet both these rules have divers exceptions and limitations." (Co. Lit. 258 *a*.) And " Lord Coke is well warranted," says Mr. Justice Story (Story

14 *

on Agency, § 166), "in suggesting that there are exceptions and limitations. Where there is a complete execution of the authority, and something *ex abundanti* is added which is improper, then the execution is good and the excess only is void. But when there is not the complete execution of the power, or when the boundaries between the excess and the rightful execution are not distinguishable, then the whole would be void."

It is contended, in the present case, that the excess and the rightful execution are easily distinguishable, and that the receipt of the money was a valid act and binding on his principal, though the settlement and release were void. But we are of opinion, that the appellants have not put themselves in a condition to have the benefit of this principle. Blount's power of attorney was a bare authority to receive money on account of the mortgage then in litigation, if the appellants chose to pay him any, leaving all the questions in dispute between the parties open to future adjustment. But the mortgagors refuse to pay him money on the conditions on which he was authorized to receive it, and give a valid acquittance. On the contrary, the money given to Blount is on their own terms, and in consideration of a settlement, arrangement, and release, which they knew, or ought to have known, Blount had no authority to make. The money paid, the bond given, the receipt taken, discharging them from the balance claimed on the bill of exchange and from one half of the last instalment, constitute one transaction. Having advanced the money on their own terms and conditions, and not on those tendered by Innerarity, they put him into a situation in which he must either affirm or repudiate the whole transaction. For if he accepted the money, they might insist that he could not reject the consideration on which it was given, on the familiar principle of the law, "that the principal cannot ratify a transaction of his agent in part, and repudiate it as to the rest." (Story on Agency, § 250.) Besides, by thus undertaking to enter into a treaty with Blount which they knew could not be binding without the assent of Innerarity, they in fact constituted Blount their ambassador or agent to obtain its confirmation. They had a perfect right to refuse to pay money on the terms dictated by Innerarity in his letter of attorney; and Innerarity had an equal right to refuse it on their terms. And when informed by him, soon after the transaction, that he considers Blount as their agent, and that he had proposed this transaction as a provisional arrangement subject to the approval of Innerarity, they keep silence till he again repudiates the transaction and files a bill to set it aside, and never intimate a will ugness

that Innerarity shall receive the money on the terms he offered, till near two years afterwards, when the money was lost by the insolvency of Blount and the bank. This assent- of the appellants to the terms of Innerarity came too late, after the money had been lost by their obstinate pertinacity in endeavours to compel him to accept it on their own terms.

We are of opinion, therefore, that the Court of Appeals have not erred in refusing to credit the appellants with this sum as a payment on the mortgage.

The decree of the Court of Appeals of Florida is therefore affirmed.

## Order.

This cause came on to be heard on the transcript of the record from the Court of Appeals for the Territory of Florida, and was argued by counsel. On consideration whereof, it is now here considered and decreed by this court, that the decree of the said Court of Appeals in this cause be and the same is hereby affirmed, with costs and damages at the rate of six per centum per annum, and that the time of redemption be extended to six months from and after the filing of the mandate of this court in this case in the court below.