WESTERN UNION TELEGRAPH CO. v. LANGE et al.

LANGE et al. v. WESTERN UNION TELEGRAPH CO.

(Circuit Court of Appeals, Ninth Circuit. February 11, 1918. Rehearing Denied April 1, 1918.)

No. 3007.

1. CORPORATIONS ⬤116—SALE OF MINING STOCK—RIGHT OF BUYERS TO TERMINATE.

A contract for the sale of mining stock provided that payments should be made, $7,500 on execution of the agreement, $11,250 on or before May 1, 1907, and deferred installments at 60-day intervals. It was agreed that, on payment of the first sum, the sellers should deposit the stock in escrow in a bank, and make an escrow agreement with the buyers and the bank, whereunder the bank should hold the stock, to be delivered to the buyers on payment of the final payment provided for. It was also agreed that if the buyers defaulted in making any of the payments, the bank should be authorized to deliver the stock to the sellers, and that all payments made by the buyers should be forfeited to the sellers, and all rights of each of the parties cease and determine. *Held*, that the contract was an optional, not an absolute, agreement to buy the stock, the buyers having the right to terminate it by failing to make a payment, that the forfeiture clause was not intended to provide an additional remedy for the benefit of the sellers, that the provision that all rights of each of the parties should cease related to the default of the buyers, and not to the return of the stock, and that the contract was not a continuing offer to sell, accepted when the buyers mailed a bank draft to the bank holding the stock in escrow to meet the second payment.

2. ESCROWS ⬤5—SALE OF MINING STOCK—DEFAULT BY BUYERS—DUTY OF BANK HOLDING IN ESCROW.

When the buyers defaulted on a payment, by the terms of the contract and the escrow agreement, there arose a duty on the part of the bank to turn over the stock to the sellers, and also all payments which the buyers had made previously.

3. PRINCIPAL AND AGENT ⬤8—BANK AS AGENT TO MAKE PAYMENT.

Where the optional buyers of mining stock, held in escrow by a bank until completion of the installment payments, arranged with the bank to pay the amount of the draft sent to it by the buyers at the bank in gold coin to the sellers, pursuant to the contract covering the sale of the stock, the bank was the agent of the buyers to pay the gold on the draft, and possession of the draft by the bank, without further act looking toward payment to the sellers in gold coin, was possession for the buyers.

4. TELEGRAPHS AND TELEPHONES ⬤36—DUTY OF TELEGRAPH COMPANY—PROMPT TRANSMISSION.

The legal duty of a telegraph company was to send a message with reasonable promptness at the regular rates and to deliver it.

5. TELEGRAPHS AND TELEPHONES ⬤36—PROMPT TRANSMISSION—INSURANCE—ORAL CONTRACT.

In the absence of regulation by a telegraph company requiring a written contract to insure delivery of an unrepeated message, a valid oral contract may be made between the company and the sender of a message, whereby the company, for a consideration, may insure prompt transmission and delivery.

6. TELEGRAPHS AND TELEPHONES. ⬤38(1)—DELAY—STIPULATION AS TO FORWARDING.

Under its stipulation as to liability in case of messages forwarded over the lines of other companies, a telegraph company was not released from liability for damages resulting from delay in the transmission of a mes-

⬤For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

sage, where the only delay took place on its own line, and not on the line of a forwarding telephone company.

7. TELEGRAPHS AND TELEPHONES 38(6)—DELAY IN TRANSMISSION—GROSS NEGLIGENCE.

Where the urgency of the situation was explained in detail to the agent of the telegraph company by the senders, when they delivered a telegram for transmission, and the senders did all they were advised to do to insure immediate delivery of the message, but the telegraph company nevertheless failed to effect a delivery until more than three days had passed, the telegraph company was guilty of gross negligence.

8. TELEGRAPHS AND TELEPHONES 70(1)—INTEREST—DAMAGES—DELAY IN TRANSMITTING TELEGRAM.

Under Civ. Code Cal. § 3287, providing that every person entitled to recover damages certain, or capable of being made certain by calculation, on a particular day, is entitled to recover interest from that day, the senders of a telegram negligently delayed in transmission were entitled to recover interest from the telegraph company at least from date of presentation of written claim to it for the amount they were damaged by the delay.

In Error to the District Court of the United States for the Second Division of the Northern District of California; Wm. C. Van Fleet, Judge.

Action by William Lange, Jr., and another against the Western Union Telegraph Company, a corporation. Judgment for plaintiffs, and all parties bring error. Judgment modified to include interest, and, as modified, affirmed.

Action for damages against the telegraph company because of delay in transmission and delivery of a telegram sent by Lange and Hastings from Oakland, Cal., to the Lyon County Bank, Yerington, Nev. After trial to the court, judgment for $11,250 went against the telegraph company, whereupon it brought writ of error; and because the District Court refused to include interest upon said sum, Lange and Hastings also sued out writ of error. The entire record is presented in one transcript, and for convenience we will refer to the parties as they stood, plaintiffs and defendant, in the trial court.

Samuel Poorman, Jr., of Los Angeles, Cal., for plaintiffs.

Beverly L. Hodghead, of San Francisco, Cal. (Albert T. Benedict, of New York City, of counsel), for defendant.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

HUNT, Circuit Judge (after stating the case as above). The facts found were substantially as follows: The telegraph company maintains offices in California and Nevada. On March 16, 1907, the plaintiffs made a contract with one Pitt and one Campbell, in which Pitt and Campbell agreed to sell and deliver to Lange and Hastings, and Lange and Hastings agreed to buy and receive from the parties of the first part, 625,000 shares of the capital stock of the Kennedy Consolidated Mining Company, "upon the following terms and conditions, to wit": (1) Total price of the shares was $75,000 gold coin, payable in this manner: $7,500 upon the execution of the agree-

For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ment; $11,250 on or before May 1, 1907; and deferred installment payments at 60-day intervals. (2) It was agreed that, upon payment of the first-named sum, the parties of the first part would deposit in escrow in the Lyon County Bank at Yerington, Nev., certificates of stock standing in their names, indorsed in blank by the persons in whose names the certificates stood, and representing in the aggregate 625,000 shares of capital stock of the mining company, and would thereupon enter into escrow agreement with the parties of the second part and the bank, whereunder the bank should hold the stock deposited with it, to be delivered to the parties of the second part immediately upon the payment by them of the final payment provided for in the agreement. The bank was made the agent of the parties of the first part for receiving payments to be made under the agreement and giving necessary acquittances. (3) It was agreed that, in the event of default by said parties of the second part in making any of the payments provided for, the bank should be authorized under the terms of the deposit in escrow, and was authorized by the agreement, to deliver all of the shares of stock so deposited with it pursuant to the agreement to the parties of the first part, and that "all payments theretofore made by said parties of the second part shall be forfeited to said parties of the first part, and that thereupon all rights of each of the said parties hereunder shall forever cease and determine." It was found that upon the execution of this contract Lange and Hastings paid Pitt and Campbell the initial installment of $7,500, and that thereupon Pitt and Campbell deposited in escrow with the bank at Yerington certificates representing 625,000 shares of mining stock, properly indorsed, and the bank received the certificates of stock in escrow and held the same in accordance with the contract; that on the same day, after the execution of the contract, plaintiffs arranged with the bank to treat any drafts they might send the bank in partial payment under the contract as gold coin, and to pay the amount of the draft in gold coin to Pitt and Campbell for plaintiffs, pursuant to the terms of the contract; that to make payment mentioned in the contract by the plaintiffs to Pitt and Campbell, which under the contract had to be made on or before May 1, 1907, the plaintiffs, Lange and Hastings, on April 27, 1907, sent by mail from Oakland, Cal., to the Lyon County Bank at Yerington, Nev., a draft for $11,250, payable to the order of the Lyon County Bank, the draft being perfectly good; that the draft was received by the bank at Yerington on April 30th, between the time the bank opened for business, 8:30 a. m. and 9 a. m. of the same day; that on April 29, 1907, before any telegram was delivered to the telegraph company for transmission, Lange and Hastings were informed and believed that the mining company stock was of little or no value, and upon obtaining such information they decided to make no more payments on their contract with Pitt and Campbell, and to abandon their rights in and to the stock under the contract, and to withdraw from the transaction. On the evening of April 29th, for the purpose of intercepting the draft mailed to the Lyon County Bank before it would be received or handled by the bank, and before payment would be made thereon, Lange and Hastings went to the telegraph company's office in Oakland and told the agent in charge thereof that

they wished immediately to send to the bank at Yerington, Nev., a message in these words:

"Oakland, April 29th, 1907.

"Lyon County Bank, Yerington, Nevada.

"Draft mailed you Saturday under mistake. Do not pay any sum to Pitt or Campbell. Return draft. Letter follows.

"Hastings and Lange."

It is found that the plaintiffs at that time said to the agent of the telegraph company that it was absolutely necessary that the message be delivered to the bank before the bank opened for business on the 30th of April, and they wished to know how plaintiffs could be absolutely assured that the message would be so delivered, telling the agent of the telegraph company that they had a contract for the purchase of shares of mining stock and that a payment was to be made before May 1st to Pitt and Campbell, mentioned in the message, through the bank, or that in default the contract to buy the stock would be forfeited. It is also found that the plaintiffs told the defendant that unless the message to be transmitted was delivered before banking hours on the 30th the draft would be paid and the money lost to the plaintiffs. The court finds that thereupon the telegraph company, through its agent, represented to the plaintiffs that the defendant would insure the immediate delivery of the message to the bank at Yerington if plaintiffs would pay defendant $1.45, which was in excess of the regular charges for transmitting the message from Oakland to Yerington; that plaintiffs accepted the proposal, and to insure immediate delivery paid the money, and the telegraph company, by its agent, wrote upon the message, below the date, "Deliver immediately"; that the $1.45 paid was in excess of the regular tolls for the transmission and delivery as an unrepeated message, and that it was agreed that the defendant would immediately transmit and immediately deliver the message; that the message was on a blank form, upon the back of which was printed a statement to the effect that, to guard against mistakes or delays, the sender should order the message repeated, and for this one-half the regular rate was the charge. In addition this printed matter also stated that it was agreed between the sender of the message and the company that the company should not be liable for mistakes or delays in transmission or delivery, or for nondelivery of any unrepeated message, beyond the amount received for sending the same, nor for mistakes or delays in the transmission or delivery, or for nondelivery of any repeated message beyond 50 times the sum received for sending the same, unless specially insured, and that the company is made the agent of the sender, without liability, to forward any message over the lines of any other company when necessary to reach its destination. There was also a clause that correctness in the transmission of a message to any point on the lines of the company could be insured by contract in writing, stating the agreed amount of risk, and payments of premium at prescribed rates, and that no employé of the company is authorized to vary the foregoing. Other clauses in this printed matter on the back of the message are not material to the present case. The court finds that neither Hastings nor Lange read the printed matter on the blank, and did not know its

terms, and that the agent of the defendant company did not call their attention to the printed matter; that the message was not repeated by the telegraph company, although plaintiffs directed that the message be transmitted in such manner as the rules required in order that the telegraph company would insure transmission and immediate delivery of the message to the bank; that in April and May, 1907, telegraphic communication between Oakland and Yerington was by telegraph lines over the Western Union from Oakland, Cal., to Wabuska, Nev., which was the terminus of the Western Union line for Yerington messages, and thence by telephone over the line of the Yerington Electric Company to Yerington; that the Yerington Electric Company at that time operated the only telephone or telegraph line between Wabuska and Yerington, and, in order to transmit the telegram by telegraph or telephone beyond Wabuska, it was necessary that it be forwarded from Wabuska over the line of the Yerington Electric Company to Yerington; that each of the companies received all messages offered by the other company for further transmission, subject to the stipulations on the telegram blanks so far as applicable, each company charging therefor its own separate tolls; that the Yerington Electric Company's office and the Western Union Telegraph Company's office were both in the Southern Pacific Railroad Company station at Wabuska, and that the telephone instrument of the Yerington Electric Company in said office was within a few feet of the telegraphic instruments of the Western Union Company; that the Southern Pacific Company employed an agent at Wabuska to attend to its railroad business, and that, by agreement between the railroad company and the telegraph company, the agent was employed to handle the telegraph business of the Western Union Company at Wabuska—that is, to receive messages transmitted to that point over the lines of the Western Union Company and transmit the messages received by him, and by arrangement between the railroad company and the Yerington Electric Company, the agent of the railroad company was employed to handle the telephone business of the Yerington Electric Company at Wabuska, and to receive and transmit all messages for transmission; that the telegraph company did not promptly, on the evening of April 29th, transmit the same to Wabuska, Nev., and did not deliver the message to the Yerington Electric Company, but failed to deliver the message to Wabuska until May 2d, and failed to deliver the message to the Yerington Electric Company until May 2d; that, if the telegraph company had acted with promptness, the message would have been received before the bank received the draft, but that, because of the gross neglect on the part of the telegraph company, the message was not delivered to the Lyon County Bank until the 2d of May; that on the 30th of April, between 8:30 and 9 o'clock a. m., the bank received the draft, and thereafter, pursuant to its arrangement with the plaintiffs, treated the draft as gold coin, paid over the amount to Pitt and Campbell under the terms of the contract, and on account of the payment under the terms of the contract, to be made before May 1st, credited plaintiffs for the amount so paid upon the contract; that the bank then forwarded the draft to the drawee for payment, and in due time the draft was paid; that the bank was wholly without knowledge of

the message, or desire on the part of the plaintiffs that the payment should not be made. It is further found that the plaintiffs made no further payments on the purchase price of the shares of stock, but abandoned the contract with Pitt and Campbell, and forfeited and lost all moneys paid thereon; that the 625,000 shares of stock of the mining company have been practically valueless since the 29th of April, 1907, and that, by reason of the gross negligence of the telegraph company in failing to transmit and deliver the telegraphic message as it agreed to do to the bank, plaintiffs lost the amount of the draft.

[1, 2] The contentions of the defendant with respect to the contract between Lange and Hastings and Pitt and Campbell are that it was an absolute agreement to buy the mining stock, and that the forfeiture clause at the end of the agreement was intended to provide an additional remedy for the benefit of the vendors; that the provision in the contract that "thereupon" all rights of each of the parties should cease relates, not to the default of Lange and Hastings, but to the return of the stock, which was not shown to have been returned; that the contract, even if construed to be an option, was a continuing offer to sell, which was accepted when the plaintiffs mailed the bank draft before filing the telegram. But as we read the whole contract, and gather from it the intentions of the parties, none of these points is sound. The language of the contract was that Pitt and Campbell agreed "to sell and deliver" and Lange and Hastings "to buy and take and receive" upon the terms and conditions which followed. The terms included payment in gold coin at times specified; the conditions required deposit by Pitt and Campbell in escrow with the bank certificates to be indorsed in blank, and that an escrow agreement should be made between Pitt and Campbell and Hastings and Lange and the bank, whereunder the bank would hold the shares to be delivered to Hastings and Lange immediately upon the payment by Hastings and Lange of the last payment called for under the provisions of the agreement. Furthermore, in case of default by Lange and Hastings in making any of the payments, these things were to follow: (1) The bank was authorized to deliver all the shares deposited to Pitt and Campbell; (2) all payments theretofore made—that is, all payments which had been made by Hastings and Lange prior to the default— were forfeited to Pitt and Campbell; and thereupon, that is to say, when default occurred immediately the authorization to deliver became effective, forfeiture accrued, and all rights of Hastings and Lange and Pitt and Campbell under the contract ceased and became determined.

The evident purpose of the parties was to make an agreement, optional in its character, and so plain in its terms that, if Hastings and Lange should default in making any of the payments, the agreement itself would at once provide a direct and complete adjustment and final determination of their business relationship under the contract. Such contracts are not unusual in mining sections, where the investor takes the chance that upon developing the property involved he may find his hopes rewarded and feel justified in making the deferred payments, in order to receive the deed for the mining property in escrow; but, should he find the property has not developed as he hoped

for, he may default and, beyond losing all he has expended in development, is released of further obligation in the premises, and the owner is compensated by the forfeiture of payments already made, and is fully reinvested with the property itself. They are quite different from such a contract of sale of real estate as we find in Stewart v. Griffith, 217 U. S. 323, 30 Sup. Ct. 528, 54 L. Ed. 782, 19 Ann. Cas. 639. The practical effect of such an arrangement is to give the right to the purchaser to determine from time to time whether he will pay further installments, and so keep up the contract, or forfeit what he has already paid in, give up all rights, and avoid further liability. Ramsey v. West, 31 Mo. App. 676; Williamson v. Hill, 154 Mass. 117, 27 N. E. 1008, 13 L. R. A. 690.

We take the further view that, when Hastings and Lange defaulted, by the terms of the contract there arose a duty on the part of the bank to turn over the stock to Pitt and Campbell, and also all payments which Hastings and Lange had theretofore made. The escrow agreement, while specially referred to, was in itself really separate from the contract between Hastings and Lange and Pitt and Campbell, who were the only parties to the contract, which defined when their respective rights thereunder would cease. Abandonment and forfeiture gave Pitt and Campbell right to their stock. The obligation of the bank to turn over the stock and forfeit payments was then a matter between the bank and Pitt and Campbell; the bank's duty not at all lessened, however, by the cessation of the rights of each of the parties to the main contract. The bank by its relation was holding as a trustee, with authority to turn over by express agreement of both parties.

[3] We cannot sustain defendant's point to the effect that, assuming that the Pitt and Campbell contract was one of option, nevertheless the telegraph company would not be liable because the option was a continuing offer, which was accepted by the mailing of the draft to the bank, the agent of Pitt and Campbell, for the purpose of receiving payments, and that such acceptance could not subsequently be withdrawn. The finding of the court is that, after the execution of the contract and on the same day, Hastings and Lange arranged with the bank to pay the amount of the draft sent to the bank by them at the bank in gold coin to Pitt and Campbell, for plaintiffs, pursuant to the terms of the contract, and also that the bank, on the day that it received the draft, did pay in gold coin to Pitt and Campbell the amount of the draft, pursuant to its arrangements with Hastings and Lange. It is clear to us that the bank was the agent of Hastings and Lange for the purpose of paying the gold upon the draft, and possession of the draft, without further act looking toward payment to Pitt and Campbell in gold coin, would be possession for Hastings and Lange. The bank was subject to the control of Hastings and Lange with respect to the draft until gold coin had been advanced by it under its previous understanding with Hastings and Lange, and if the bank had received the telegram in due time the changed purpose of the plaintiffs would have been made known in ample time.

[4] We pass to the defenses based upon the stipulations upon the back of the message blank. It is pertinent to bear in mind that this

action has little to do with any mistake in transmission of a telegraph message. The cause of action arises out of delay on the part of the telegraph company in transmission and delivery. Repetition of the message would have availed nothing, as no complaint is made that there was any mistake in the verbiage of the message. The legal duty of the telegraph company was to send the message with reasonable promptness at the regular rates and to deliver it. In Box v. Postal Telegraph-Cable Co., 165 Fed. 138, 91 C. C. A. 172, 28 L. R. A. (N. S.) 566, the Court of Appeals for the Fifth Circuit said that the regulation of the company with respect to repeated messages, while purporting to be made to guard against mistakes or delays, should be construed to refer to such mistakes and delays as could be corrected or avoided by repetition and comparison; otherwise, a delay caused by the conduct of the company in negligently failing to send or to attempt to send the message would come within the rule. "It is difficult," said the court, "to believe that this stipulation was intended by the parties to be applicable to a case in which the conduct of the company made it impossible for the message to be repeated." As bearing upon the question we cite Purdom Naval Stores Co. v. Western Union Telegraph Co. (C. C.) 153 Fed. 327; Postal Telegraph-Cable Co. v. Nichols, 159 Fed. 643, 89 C. C. A. 585, 19 L. R. A. (N. S.) 870, 14 Ann. Cas. 369; Pacific Postal Telegraph Co. v. Fleischner et al., 66 Fed. 899, 14 C. C. A. 166. Cases like Primrose v. Western Union Telegraph Co., 154 U. S. 1, 14 Sup. Ct. 1098, 38 L. Ed. 883, and Coit v. Western Union Telegraph Co., 130 Cal. 657, 63 Pac. 83, 53 L. R. A. 678, 80 Am. St. Rep. 153, and others cited, which involved mistakes in the language of messages sent, are not authority upon the point here presented.

[5, 6] We do not believe that it was necessary that there should have been a written contract of insurance. A contract to insure specially the correctness in the transmission of a message must be made in writing; but there is no regulation which requires a written contract to insure the delivery of an unrepeated message. We think a fair implication is that an oral contract may be made between the sender of a message and the telegraph company, whereby the company, for a consideration paid, may insure the prompt transmission and delivery of a message. Nor is the defendant to be relieved of liability under stipulation affecting liability because it was necessary to forward the message over the lines of the electric company from Wabuska to Yerington. The findings show that the telegraph company never used the electric lines to forward the message to Yerington until May 2d. There was, therefore, no delay on the telephone line. But, assuming that there is doubt of this, it could not help defendant, as the agreement made was specially to deliver the message at Yerington. Postal Telegraph, etc., Co. v. Harriss, 56 Tex. Civ. App. 105, 121 S. W. 358, 122 S. W. 891.

[7] It is said that under no circumstances should the court have found that the telegraph company was guilty of gross negligence in the delay in transmission and delivery. Again we must hold against the defendant. The facts show that the situation of the plaintiffs was

in great detail explained to the defendant's agent at the time that the telegram was delivered at Oakland for transmission, and that plaintiffs did all that they were advised to do to insure immediate delivery of the message. But, notwithstanding their special efforts and the assurances of the telegraph company, there was a failure to deliver until more than three days had gone by. In our opinion, the circumstances proved gross negligence. Western Union Telegraph Co. v. Cook, 61 Fed. 624, 9 C. C. A. 680; Union Construction Co. v. Western Union Telegraph Co., 163 Cal. 298, 125 Pac. 242; Pierson v. Western Union Telegraph Co., 150 N. C. 559, 64 S. E. 577; Redington v. Pacific Postal Telegraph Co., 107 Cal. 317, 40 Pac. 432, 48 Am. St. Rep. 132.

[8] The claim for interest upon the amount awarded as damages rests upon the argument that the telegraph company, for an extra compensation, having insured the immediate transmission and delivery of the delayed message, was bound to pay plaintiffs as indemnity the amount of the draft on a day certain, in the event that the message was delayed, and that one of the implied terms of such an agreement was the obligation to pay interest as damages by reason of failure to indemnify, without regard to whether the loss by such delay was or was not a liquidated sum. In our opinion, the real question between the parties to the litigation was simply whether the defendant was originally liable for $11,250, that being the amount of the draft paid against the wishes of Lange and Hastings as expressed in the delayed telegram. The message having been under special contract with the defendant, the liability of the defendant was either in the sum named or nothing. The loss which Lange and Hastings suffered was the exact amount of the draft, and since no benefit of any kind accrued to the plaintiffs there was no offset to be allowed as against that loss. By section 3287 of the Civil Code of California:

"Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor, from paying the debt."

Under this statute plaintiffs should recover interest at least from the date of the presentation of their written claim to the defendant for damages in the sum of $11,250, filed with the defendant June 26, 1907. Curtis v. Innerarity, 6 How. 146, 12 L. Ed. 380.

The judgment will therefore be modified, so as to include therein interest on $11,250, the principal of plaintiff's demand, from June 26, 1907, and, as so modified, it will be affirmed.