FREYGANG et al. v. VERA CRUZ & P. R. CO.

VERA CRUZ & P. R. CO. v. FREYGANG et al.

(Circuit Court of Appeals, Fourth Circuit. May 29, 1907.)

Nos. 706, 707.

1. CONTRACTS—RAILROAD BRIDGE CONSTRUCTION—ESTIMATES OF ENGINEERS.

A contract for railroad bridge construction in Mexico provided that the railroad company's engineers should supervise the work, approve the number of men to be sent from the United States, their salaries, fitness, the number to be employed, that they should O. K. all important purchases of material and those obtained outside of Mexico, with the right to determine what were important, to voucher and approve all expense bills, and pay rolls in triplicate, etc. *Held* that, the railroad company having accepted and paid 44 out of 49 of such estimates without question, the court in an action on the contract properly held that the estimates so made were prima facie evidence of the work done, and that the account should be based on the estimate, subject to correction, contradiction, or impeachment for error, mistake, omission, or concealment.

2. CORPORATIONS—AGENTS—AUTHORITY—REPUDIATION OF ACTS.

Where a contract for railroad bridge construction on a percentage basis originally limited the contractor's net compensation for building the original bridges to $33,000, and thereafter the assistant to the president of the railroad company was sent to confer concerning expediting the work, and then waived the compensation limit so fixed, and the railroad company did not promptly repudiate his acts, it would be assumed that he had authority to act in the premises, and that the waiver was binding on the corporation.

**3.** CONTRACTS—PERFORMANCE—CURRENCY—RATE OF EXCHANGE.

Where a contract, made on the percentage basis, for railroad bridge construction in Mexico provided for payment on the Mexican money basis, the exchange to be effected on the Mexican rate existing at the time in Mexico City, the bridge company, having contracted with certain employés taken from the United States for payment in United States currency or in Mexican at a flat rate of exchange, was chargeable with any loss suffered because of changes in the rate of exchange during the performance of the contract.

**4.** SAME—ACCOUNTING.

A contract for Mexican bridge construction provided that the railroad company should pay the contractor the exact cost plus 15 per cent. for his profit, and that all payments should be made in Mexican money at the rate of exchange existing at the time of payment in Mexico City. $686,481.37 was paid in Mexico to American employés, and to reimburse plaintiff for this sum the railroad company forwarded gold drafts for $343,240.68, which the bridge company converted into Mexican currency at the rate of $2.20, making a gain of $31,203.69. *Held*, that the bridge company was properly required to account for such gain to the railroad company.

**5.** INTEREST—UNLIQUIDATED DEMANDS—DEMAND—SUIT BROUGHT.

Where a railroad bridge construction contract was made in Missouri for performance in Mexico, and suit for an accounting was brought thereon in Maryland, where funds of the railroad were attached, the contractor was entitled to recover interest on the balance due from the date of demand or suit brought, under Rev. St. Mo. 1899, § 3705 [Ann. St. 1906, p. 2073], declaring that creditors shall be allowed interest at 6 per cent., when no other rate is agreed on, for all moneys after they become due and payable on written contracts and on accounts after maturity and demand made.

In Error to the Circuit Court of the United States for the District of Maryland.

Edward Duffy and William C. Scarritt (Bond, Robinson & Duffy and Scarritt, Scarritt & Jones, on the briefs), for the Midland Bridge Company.

Carroll T. Bond and J. Southgate Lemon (Marbury & Gosnell, on the briefs), for the Vera Cruz & Pacific Railroad Company.

Before PRITCHARD, Circuit Judge, and WADDILL and DAYTON, District Judges.

DAYTON, District Judge. These are cross-writs of error, sued out in an action of assumpsit originally instituted in the superior court of Baltimore City, Md., by Henry Freygang and Albert A. Trocon, copartners, trading as the Midland Bridge Company, against the Vera Cruz & Pacific Railroad Company, which was regularly removed into the Circuit Court of the United States for the District of Maryland by the defendant. Hereinafter the original plaintiffs will be referred to as the "Bridge Company" and the original defendant as the "Railroad Company." The suit was instituted in the state court on September 12, 1904, to recover $127,976.63, and on the day following an attachment was sued out, which was served upon Allan McLane, receiver of the Maryland Trust Company, garnishee, who subsequently confessed possession of sufficient funds belonging to the railroad company to satisfy the demand. By various proceedings had, the pleadings were settled by the court below, and the parties came to issue

154 F.—41

substantially upon the general issue of nonassumpsit and counter-claim. On January 22, 1906, by written stipulation filed, trial by jury was waived, and the court was requested to find the facts specially, and on February 7, 1906, the parties further agreed that exceptions to the admissibility of evidence, to requests for special findings, and to rulings of the court should be reserved on both sides, to be reduced to writing and filed within a reasonable time thereafter, with same effect as if so reduced to writing before findings made; and thereupon on that day the court filed its findings of fact, embraced in 30 distinct paragraphs, and, as a conclusion of law based thereon, entered judgment in favor of the plaintiff bridge company against the defendant railroad company for an aggregate sum, after allowing all credits, of $38,406.43, with interest from the date of the judgment and costs. To this judgment the bridge company has assigned 8 errors and the railroad company 23. Although the record is voluminous, a brief statement of the facts will be sufficient: The railroad company, a West Virginia corporation, was on August 24, 1900, engaged in the construction of a line of railroad in Mexico. On that day it entered into a contract with the bridge company, a copartnership, the members of which were citizens of Missouri, whereby the bridge company was to furnish material, and construct, complete, the superstructure of five bridges on said railroad line, paint the metal work of such superstructure, and put in place the railway floor, in accordance with plans and specifications attached. For this work the railroad company agreed to pay "the actual cash cost thereof, plus fifteen (15) per cent. for his profit." It was further provided that, in computing the cost of work, there should be included "all items of material, labor, and transportation of men, materials, and plant to and fro," but no allowance was to be made "for cost of plant or deterioration of same, or for the time or personal expenses (other than railroad and Pullman fares) of either member of the firm, or for interest on money required to carry on the work." The contract further provides that medical attendance and medicine at site should be paid by the railroad company, but no other medical or hospital expenses should be so paid; that the railroad company should pay for the housing of employés, "but the commissariat department shall be considered as a thing apart from this contract. The contractor (bridge company) shall manage it at his own expense, and shall charge enough for board to reimburse himself for the entire outlay connected therewith." It further provides:

"In order to keep accounts straight, all payments are to be made in Mexican money, and the rate of exchange to be used for charges in American money shall be that ruling in the city of Mexico on the date of the engineer's estimate."

It then provides the details of how work should be done, by whom approved, and other matters not material here. This contract was modified February 4, 1901, in writing, in regard to traveling expenses, but this modification is not material. On October 10, 1901, the bridge company was awarded the building of the substructure of the Boca del Rio bridge upon same terms contained in original contract, and again in September, 1902, and January, 1903, it was awarded the con-

tract of building all unbuilt bridges and culverts on the road (with two portions excepted), and also the railroad company's shops at Tierra Blanca. To complete all this work required a period of over four years, and it is not surprising that, when the time of adjustment and settlement of accounts came, differences should arise between these companies. These differences are the cause of this controversy.

The questions are almost wholly ones of fact. The court below very patiently heard the testimony, and, sifting it most carefully, found the facts therefrom. The many exceptions taken and alleged errors assigned by the railroad company need no very extended consideration. Out of the 23, 2 are expressly abandoned. The first, which is perhaps most strenuously insisted upon, is based upon the fact that the court below held the estimates made monthly by the engineer in charge, who was selected, employed, and paid by the railroad company, to be prima facie evidence of the work thus done, and that the account should be based upon such estimates, subject to correction, contradiction, or impeachment for error, mistake, omission, or concealment. When it is remembered that these engineers, employed by the railroad company, by the terms of the specifications expressly made part of the contract, and by the terms of the contract itself, were empowered and required to supervise all this work; to approve the number of men to be sent from the United States to the work, the salaries to be paid them, and to determine their fitness for the work before they were engaged; to determine and approve the number of men to be employed at each site, ordering more where too few were engaged, and diminishing the number where too many were at work; to make reduction for negligence in having idle men on hand; to O. K. the purchase of material obtained outside of Mexico, and all important purchases of material in same, with right to determine what were important; to require all expense bills to be properly vouchered, and to allow none paid without being approved by them; to make these monthly estimates upon complete vouchers in triplicate for all bills and upon signed pay rolls in triplicate furnished by the bridge company, which estimates and statements were so made to the number of 49, of which the first 44 were paid by the railroad company without serious question or dispute at the time, and part of No. 45 was also paid—when, we say, all these facts are taken into consideration, we can see no ground for complaint upon the part of the railroad company of this ruling. These estimates became so far agreed upon as to become properly the basis of the settlement.

In the original specifications the limit of net compensation to the bridge company for the building of the original five bridges was fixed at $33,000, which in the addenda thereto was raised to $40,000. The trial court allowed a sum in excess of this amount, holding as a fact that this limit had been expressly waived by the railroad company. The latter here complains of this action, insisting that the evidence upon which this alleged waiver is based was incompetent to establish such, and should have been excluded. This evidence briefly is that in April, 1901, during the construction of the Papaloapam bridge, conferences were held between Jay, assistant to the president of the railroad company, the resident engineer, and one of the members of

the bridge company with a view to expediting work on this bridge, and the bridge company insists that as a result it undertook to so expedite and complete the work; Jay, on behalf of the railroad company, agreeing to waive this net profit limit. Waddell, one of the engineers, testifies, corroborating Freygang and other witnesses introduced by the bridge company, that he received a letter from Jay setting forth this waiver, but it had since become lost. Jay denies he made such waiver, or that he had authority to do so. We think the trial court rightly held that this waiver was made. It is undoubtedly true the work was expedited. The prior delay in the work upon this eight-pier bridge had been solely caused by the failure of the railroad company to deliver the bridge company's plant and the necessary material upon the ground by reason of the noncompletion of its track to that point. This delay was costly to the contractors, and it would seem that it and the extra cost of expedition furnished an adequate consideration for this waiver. Jay was assistant to the president, and when sent to confer must be assumed to have had power to act, or, if he did not have such power, prompt repudiation upon the part of his chief (the president) of his act was necessary.

These are the principal and important matters complained of by the railroad company. The many other exceptions relate to specific items, to technical objections to the finding or failure to find certain facts and conclusions of law, which we have carefully considered, and find without merit.

Coming now to the eight exceptions taken to this judgment by the plaintiff bridge company, it is sufficient to say that they relate substantially to three items, and they may be stated briefly as follows: First. To the court's refusal to allow it the sum of $1,062 for premium paid surety company for its suretyship on bond required by contract to be given by the bridge company to the railroad company. Second. To the court's allowance of a credit to the railroad company of $31.203.-69 for "difference of exchange on gold pay rolls paid in Mexico." Third. To the court's refusal to allow interest upon the indebtedness from the time due.

In argument here the first claim has been abandoned, and need not be further considered.

The second is earnestly insisted upon, and requires some consideration. The whole controversy here grows out of the fluctuating value of Mexican money compared with the gold standard money of the United States. From the beginning of the contract, in August, 1900, until May, 1901, the rate of exchange varied between $1.96 to $2 of Mexican for $1 United States. During the remainder of the time spent in the execution of the contracts, the rate fluctuated from $2 to $2.67 of Mexican for $1 United States. A large number of workmen from the United States was employed, and the bridge company, very soon after the work commenced, prepared a contract, which it required its American employés to enter into, which provided, among other things, for the matter of expense incurred by them in going to Mexico to the work and returning to the United States, a scale of wages to be paid, based on the United States gold dollar, dependent upon length of service; that these men should be charged board at the rate of

$8.40 Mexican per week and hospital fees at the rate of $1 Mexican per month for each $100 Mexican and fraction thereof of salary; and that the men should be paid at their rated wages in gold at Kansas City, or, if paid on the work in Mexico, in Mexican currency at the rate of two for one. It is distinctly and always to be borne in mind that this contract was between the bridge company and its American employés, and that the railroad company was not a party to it; that the contract between the railroad company and the bridge company expressly provided:

"In order to keep accounts straight, all payments are to be made in Mexican money, and the rate of exchange to be used for charges in American shall be that ruling in the city of Mexico on the date of the engineer's estimate."

And, further:

"No change or alteration shall be made in the terms or conditions of this agreement without the written consent of both parties hereto."

Subject to these terms and upon this basis of payment, the bridge company was to be reimbursed its actual expenditure for labor and material and 15 per cent. upon this actual expenditure for its compensation. If the bridge company conducted a commissary, by the terms of the contract it was to be a thing apart, and conducted at its own expense. If it ran a boarding house, it was to charge the men board enough to reimburse it, if not, bear the loss; and so, too, if it established a hospital, it could call on the railroad company for medical attendance and medicine "at the site,"—nothing more.

By the terms of its contract the bridge company was to be paid upon the Mexican money basis, and the exchange of moneys was to be effected upon the Mexican rate existing at the time in Mexico City. The most natural thing for it to have done, in our judgment, would have been to have also paid its men, run its commissary, its boarding houses, and its hospital upon this same basis. It may have been somewhat inconvenient, but, if on this account it saw fit by private contract with its men (a contract of chance and hazard, too) to establish a new and different rate of exchange from that fixed by the contract it held with the railroad company, by which it might have gained, but as it turned out, in fact, lost, it certainly cannot expect the railroad company to indemnify it for such loss. Suppose, as contended for, that practically in the sale of its goods from the commissary, in the conduct of its boarding houses and hospital, by virtue of its having gotten on the losing side of this its private contract with its men, it was selling goods, boarding and treating its men at a discount, upon fixed rates, whose fault was it? If it fixed the wage scale, the commissary prices, the boarding rates and hospital fees upon the gold standard, while it was to receive its money on the Mexican one, it certainly did it with its eyes open. Counsel with great earnestness have dwelt upon the fact that the estimates approved by the engineers in charge allowed for this arbitrary basis and the resulting loss arising therefrom, and with much ability and learning argue that the railroad company is bound by these estimates and this action of its engineers; citing very many authorities. As these authorities, however, relate to differences arising between contractors and employers touching matters

distinctly left by the contract to the arbitrament of the engineers, or distinctly within the scope of such engineers' duty or authority, we must put them aside as not being in point; for here the matter of fixing the rate of exchange or ratifying any arbitrary or other rate was wholly outside of the scope of the engineers' authority or power, because against the very terms of the contract between the principals which had fixed it, and could not be changed except in writing by the principals themselves.

The trial court ascertained:

"That the sum paid in Mexico in settlement with American employés was in Mexican currency $686,481.37. To reimburse this sum the plaintiffs obtained from the defendant gold drafts amounting to $343,240.68. These gold drafts they converted into Mexican currency at a rate of at least $2.20, and received therefor at least $775,129.49 Mexican, making a gain over the $686,-481.37 of $68,648.12 Mexican. This sum converted into gold at $2.20 is a gain of $31,203.69, and for this sum the plaintiffs should account to the defendant."

We think this holding right under the terms of the contract and the conditions and circumstances existing touching these transactions, and therefore hold the bridge company's assignment of error in this particular to be unavailing.

This brings us to the last objection made by the bridge company touching the disallowance of interest. While it is true this cause was trial in Maryland, where by statute the allowance of interest is left to the discretion of the court, yet it is also true that this contract was a Missouri one. The statute of this latter state (section 3705, c. 40, Rev. St. Mo. 1899 [Ann. St. 1906, p. 2073]), provides:

"Creditors shall be allowed to receive interest at the rate of six per centum per annum when no other rate is agreed upon for all moneys after they become due and payable on written contracts and on accounts after they become due and demand of payment is made."

The Supreme Court of Missouri in construing this statute has held that such interest will not be allowed on account until after demand is made. Evans v. Western Brass Mfg. Co., 118 Mo. 548, 24 S. W. 175; Southgate v. A. & P. R. R. Co., 61 Mo. 89. But it has further held that the institution of suit constitutes such demand, and in case no prior demand has been proven, then interest should be awarded from the date of service of process, or, in the absence of proof of date of service, from the commencement of the suit. Dempsey v. Schawacker, 140 Mo. 680, 38 S. W. 954, 41 S. W. 1100. The controversy arose in Maryland only by reason of the accidental location of the attached funds there of the railroad company. By the finding of the trial court, an aggregate of $38,406.43 remained unpaid, and suit to recover it had been instituted on September 12, 1904, nearly 17 months before judgment rendered. We think the bridge company clearly was entitled to interest for this period, both under the Missouri statute and the federal authorities. Curtis v. Innerarity, 6 How. 146–154, 12 L. Ed. 380; Sturm v. Boker, 150 U. S. 312–341, 14 Sup. Ct. 99, 37 L. Ed. 1093; Crescent Mining Co. v. Wasatch M. Co., 151 U. S. 317–323, 14 Sup. Ct. 348, 38 L. Ed. 177; Spalding v. Mason, 161 U. S. 375–385, 16 Sup. Ct. 592, 40 L. Ed. 738.

We therefore find the court below erred in not allowing to the bridge company interest upon its judgment of $38,406.43 from September 12, 1904, the date of the institution of the suit, and for this reason only the cause upon the writ of error of the plaintiff bridge company is reversed and remanded, with costs against defendant railroad company. And the cause upon the writ of error sued out by the railroad company against the bridge company is in all respects affirmed, with costs to the bridge company.