### UNITED STATES v. DUGGAN.
### No. 14731.

United States Court of Appeals, Eighth Circuit.
March 9, 1954.

Robert E. Brauer, Asst. U. S. Atty., St. Louis, Mo. (George L. Robertson, U. S. Atty., William W. Crowdus, U. S. Atty., and James C. Jones, III, Sp. Asst. to U. S. Atty., St. Louis, Mo., on the briefs), for appellant.

George O. Durham, St. Louis, Mo., for appellee.

Before SANBORN, JOHNSEN and COLLET, Circuit Judges.

SANBORN, Circuit Judge.

This is an appeal from an order dismissing with prejudice a claim of the United States against National Aircraft Corporation, of Elwood, Indiana, subsidiary debtor in reorganization under Chapter X of the Bankruptcy Act, Title 11 U.S.C.A. § 501 et seq., upon the ground that the claim of the Government, as stated in its proof of claim, is not one upon which relief could be granted.

The Government's claim is based upon the default of the National Aircraft Corporation (which will be referred to as the Contractor) in the performance of a procurement or supply contract dated March 23, 1942, which, as modified by "Supplemental Agreements", obligated the Contractor to manufacture, furnish and deliver to the Government, at stated times and in accordance with certain specifications, 90 gliders and certain spare parts and materials for use therein, at an estimated cost of $1,659,277.50 plus a fixed fee of $82,531.38. The Government agreed to pay the Contractor, "upon satisfactory delivery of all items specified," the cost plus a fixed fee of five per cent of such cost. It was also agreed that the fixed fee was not subject to adjustment, and that allowable items of cost would be determined by the Contracting Officer for the Government in accordance with published regulations promulgated by the Treasury Department, and approved by the Secretary of War, for the determination of the cost of performing a Government contract. We have set forth in the margin provisions of the contract which are considered pertinent.[1]

1. "Article 3—Consideration

&ast; &ast; &ast; &ast; &ast;

"(e) The Contractor shall, to the extent of its ability, procure materials and services at the most advantageous prices available, with due regard to securing prompt delivery of satisfactory materials, take all cash and trade discounts, rebates, allowances, credits, salvage, commissions and bonifications, and when unable to take advantage of such benefits it shall promptly notify the Contracting Officer to that effect and the reason therefor. In determining the actual net cost of articles and materials of every kind required for the purpose of this contract, there shall be deducted from the gross cost thereof all cash and trade discounts, rebates, allowances, credits, salvage, commissions and bonifications which have accrued to the benefit of the Contractor or would have so accrued except for the fault or neglect of the Contractor. Such benefits lost through no fault or neglect on the part of the Contractor, or lost through fault of the Government, shall not be deducted from gross costs.

&ast; &ast; &ast; &ast; &ast;

"Article 6—Payments

"(a) Reimbursement for Cost.—The Government will currently reimburse the Contractor for such expenditures made in accordance with Article 3 hereof as may be approved or ratified by the Contracting Officer, &ast; &ast; &ast;.

"(b) Payment of the Fixed Fee.— Ninety per cent (90%) of the fixed fee &ast; &ast; &ast; shall be paid as it accrues, in monthly installments based upon the percentage of the completion of the work as determined from estimates made and approved by the Contracting Officer. Upon completion of the work and its final acceptance, any unpaid balance of the fee &ast; &ast; &ast; shall be paid to the Contractor.

"(c) Advance Payments.—Advance payments may be made from time to time for the supplies called for, when the Secretary of War deems such action necessary in the interest of the national defense &ast; &ast; &ast; upon such terms and conditions and with such adequate security as the Secretary of War shall prescribe.

&ast; &ast; &ast; &ast; &ast;

"Article 9—Termination of Contract by Government

"(a) Should the Contractor at any time refuse, neglect or fail to prosecute the work with promptness and diligence, or default in the performance of any of the agreements herein contained, or should conditions arise which make it advisable or necessary in the interest of the Government that work be discontinued under this contract, the Government may terminate this contract by a notice in writing from the Contracting Officer to the Contractor. Such termination shall· be effective in the manner and upon the date specified in said notice and shall be without prejudice to any claims which the Government may have against the Contractor. &ast; &ast; &ast;

"(b) Upon the termination of this contract as hereinbefore provided, full and complete settlement of all claims of the Contractor arising out of this contract shall be made as follows:

Under Supplemental Agreements Nos. 2 and 5, the Government, at the request of the Contractor and with the approval of the Chief of the Air Corps, advanced to the Contractor $248,891.62. These funds, together with all funds received by the Contractor from the Government as reimbursement for the cost of the work, were to be kept in a special bank account separate from the Contractor's other funds. This special fund was to be used by the Contractor as a revolving fund for carrying out the purposes of the contract. Article 5 of the Supplemental Agreement No. 2 provided, in part, as follows:

" * * * In the event of cancellation or termination of the principal contract because of the fault of the Contractor, the Contractor, notwithstanding any ultimate rights

"(1) The Government shall assume and become liable for all obligations, commitments and claims that the Contractor may have theretofore in good faith undertaken or incurred in connection with said work and in accordance with the provisions of this contract, and the Contractor shall, as a condition to receiving the payments mentioned in this Article, execute and deliver all such papers and take all such steps as the Contracting Officer may require for the purpose of fully vesting in the Government the rights and benefits of the Contractor under such obligations or commitments.

"(2) The Government shall reimburse the Contractor for all expenditures made in accordance with Article 3 and not previously reimbursed.

"(3) The Government shall reimburse the Contractor for such further expenditures after the date of termination for the protection of Government property and for accounting services in connection with the settlement of this contract as the Contracting Officer may approve.

\* \* \* \* \*

"(5) If the contract is terminated for the fault of the Contractor, the Contractor shall be paid a percentage of the fee set forth in Article 3, equivalent to the percentage of completion of the contract, less ten per cent (10%) of such amount and less payments previously made.

"(6) The obligation of the Government to make any of the payments required by this Article shall be subject to any unsettled claims for labor or material or any

to be reimbursed, agrees to return to the Government, upon demand, without set-off of any sums alleged to be due the Contractor, the unliquidated balance of any advance payment. * * * If the demand made in any event set forth in this article is not met upon receipt of such demand by the Contractor, the amount demanded will bear interest at the rate of six per cent (6%) per annum from the date of the receipt of the demand until payment is made; * *."

On March 1, 1943, the contract was terminated, for default of the Contractor, by written notice to the Contractor from the Contracting Officer, in accordance with Article 9 of the contract. The Contractor was directed to terminate all subcontracts, to cancel all existing or-

claim the Government may have against the Contractor.

\* \* \* \* \*

"Article 16—Disputes

"Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the Contracting Officer, subject to written appeal by the Contractor within 30 days to the head of the department concerned or his duly authorized representative, whose decision shall be final and conclusive upon the parties hereto. In the meantime the contractor shall diligently proceed with performance.

\* \* \* \* \*

"Article 19—Representations and Stipulations Pursuant to Public Act No. 846, 74th Congress

"(a) The contractor is the manufacturer of or a regular dealer in the materials, supplies, or equipment to be manfactured or used in the performance of the contract.

\* \* \* \* \*

"Article 22—Title to Property

"The title to all work under this contract, completed or in the course of manufacture, or assembly at the Contractor's plant, shall be in the Government. Upon deliveries at the Contractor's plant or at an approved storage site, title to all purchased materials, parts, assemblies, subassemblies, tools, machinery, equipment and supplies, for which the Contractor shall be entitled to be reimbursed hereunder shall vest in the Government."

ders, and, subject to the approval of the Contracting Officer, to pay all costs incurred by the Contractor in the performance of the contract and due on or before its termination.

On September 8, 1943, the Contracting Officer demanded that the Contractor return to the Government on or before September 30, 1943, the unliquidated balance of the advanced funds, pursuant to Article 5 of Supplemental Agreement No. 2. The Contractor was notified that no further request by it for release of these funds on deposit in the special account would be approved.

On February 8, 1944, the Contractor, which, as already stated, was located in Elwood, Indiana, was adjudicated a bankrupt in the United States District Court for the Southern District of Indiana, and that court ordered that the assets of the bankrupt be sold on April 20, 1944. See In re National Aircraft Corporation, 7 Cir., 149 F.2d 548. On April 19, 1944, the day before its assets were to be sold in Indiana, the Contractor petitioned the United States District Court in Missouri to enjoin further proceedings in the federal court in Indiana and to approve the petition of the Contractor for reorganization as a subsidiary of the Christopher Engineering Company, which had on December 27, 1943, filed its petition in the federal court in Missouri for reorganization under Chapter X of the Bankruptcy Act. The reorganization court on April 19, 1944, approved the petition of the Contractor, enjoined further proceedings in the federal court in Indiana, appointed Duggan as trustee, and took jurisdiction over the Contractor's assets. The controversy between Duggan, the Missouri trustee in reorganization of the Christopher Engineering Company and of the Contractor, and Sansberry, the Indiana trustee in bankruptcy of the Contractor, with respect to the question of jurisdiction, was decided by the Supreme Court on March 4, 1946, in favor of Duggan, on the ground that the reorganization proceedings in Missouri were not subject to collateral attack. Duggan v. Sansberry, 327 U.S. 499, 66 S.Ct. 657, 90 L.Ed. 809.

Several proofs of claim were filed by the Government against the Contractor in the reorganization proceedings in Missouri. The trustee filed objections to the Government's claim, and moved that it be dismissed. The proofs of claim were consolidated, as were also the objections and motions of the trustee respecting them.

The consolidated proof of claim on behalf of the Government alleged that the Contractor was indebted to it as follows:

(1) For damages of $1,712,553.67 resulting from the failure of the Contractor to perform the contract to manufacture and deliver 90 gliders. In support of this item the Government alleged that the Contractor failed to furnish 89 of the 90 gliders which it had agreed to furnish at an estimated cost plus fixed fee aggregating $1,741,808.88; that, by reason of this default, the Government was required to procure the 89 gliders from another concern at an estimated cost of $2,108,632.58; that the Government had paid the Contractor $1,345,-729.97, "representing the total audited, approved and reimbursed cost under its contract at the date of the termination thereof"; that the Government therefore suffered an estimated damage of $1,712,553.67 "($2,108,632.58 minus $1,-741,808.88 plus $1,345,729.97)."

(2) For $138,304.47, the unliquidated balance of funds advanced to the Contractor by the Government for use in performance of the contract.

(3) For $4,543.05 received by the Contractor, representing refunds on payments made by it for materials purchased or services furnished in the performance of its contract, which refunds belonged to the Government, since it had already reimbursed the Contractor for such materials or services.

(4) For $48,129.21 expended by the Contractor for purposes other than the performance of its contract with the Government, for which the Contractor

had been reimbursed by the Government, contrary to the terms of the contract.

(5) For an amount representing false and fraudulent claims presented by the Contractor and paid by the Government in the sum of $1,950.71, plus the penalties and damages provided for by 31 U. S.C.A. § 231.

(6) For $2,393.79, representing a claim for materials sold to the Contractor by the Cessna Aircraft Company, which assigned its claim to the Government June 22, 1943.

(7) For $714.68 due upon a claim of Pratt, Read & Company, Incorporated, assigned to the Government.

The Trustee's motion to dismiss the Government's claim upon the ground that it was one for which no relief could be granted was based upon the following grounds:

(1) That the proof of claim and supporting exhibits showed that the agreement between the Contractor and the Government vested exclusive jurisdiction in the agency representing the Government to audit and state the account between the contracting parties at the termination of the contract; that the proof of claim failed to allege that the required administrative determination had been made; that, in fact, none had been made; and that, in the absence of the required administrative action, the reorganization court lacked jurisdiction of the claim.

(2) That if the reorganization court assumed the jurisdiction vested in the contracting agency, which, under the terms of the contract and under applicable law, was to determine the basis of settlement under the contract, the trustee would have no opportunity to assert claims on behalf of the Contractor against the Government, since the jurisdiction of the reorganization court would be limited to counter-claims not exceeding $10,000.

(3) That the contract provides the manner and method for the determination and settlement of the rights of the parties upon its termination for any cause, and the contract was not one for the purchase and sale of gliders to the Government at a fixed price, for the breach of which the Government was entitled to recover damages on the basis asserted in the claim.

The reasons given by the District Court for granting the trustee's motion to dismiss the claim of the Government were, in substance:

(1) That the contract, the breach of which gave rise to the claim for damages was not a contract of sale, and the failure of the Contractor to perform did not create an obligation to pay damages such as would be recoverable for the breach of a sales contract.

(2) That the contract expressly provided that, in the event of its termination for fault of the Contractor, the percentage of completion of the contract should be determined by the Contracting Officer and the fixed fee calculated thereon, from which calculation there should be deducted ten per cent, and that this ten per cent was, in effect, the penalty agreed upon by the parties as the damage to the Government.

(3) That the damages for breach of the contract could not be determined initially by the court, in view of the discretion vested by the contract in the Contracting Officer and in view of the provisions for appeal within the agency.

(4) That under the provisions of the contract and the applicable law and regulations, the Government was required to adjust and settle by administrative action its rights under the contract.

We do not agree with the conclusions of the District Court, which we think are based largely upon a misinterpretation of the contract in question. Under Article 22 of the contract, title to all work completed or in the course of manufacture, and title to all purchased materials, tools, machinery, equipment, and supplies for which the debtor was entitled to be reimbursed, was at all times in the Government. Under Article 9, the Government reserved the right to

terminate the contract at any time upon written notice by the Contracting Officer to the Contractor, either for the convenience of the Government or because of the failure of the Contractor to prosecute the work with promptness and diligence or because of the Contractor's default in the performance of any of its obligations under the contract. The contract was terminated for the default of the Contractor, in accordance with Article 9 which specifically provided that "Such termination shall be effective in the manner and upon the date specified in said notice [notice from the Contracting Officer] and shall be without prejudice to any claims which the Government may have against the Contractor." It is true that the same Article of the contract provided that, upon its termination, complete settlement of all claims of the Contractor should be made by payment of all expenditures made by the Contractor and authorized by the Contracting Officer which had not been previously paid, and by the assumption on the part of the Government of all obligations incurred in good faith by the Contractor in connection with performance "and in accordance with the provisions of this contract." Article 9 also provided that, on termination of the contract for the fault of the Contractor, the Government would pay a percentage of the fixed fee equivalent to the percentage of completion of the contract less ten per cent and less payments previously made on account of the fixed fee; and further provided that the obligation of the Government to make any of the payments specified in the Article should be subject to "any claim the Government may have against the Contractor."

█ █ We do not find in the contract any agreement between the parties for the administrative determination of the claims of the Government against the Contractor upon the termination of the contract. Even if there had been in the contract no express reservation of claims in favor of the Government against the Contractor, we think the Contractor would not be relieved from liability to the Government for any loss proximately resulting from the failure of the Contractor to perform its obligations under the contract or its legal obligation to reimburse the Government for moneys received by the Contractor to which it was not entitled.

The District Court's conclusion that it was without jurisdiction to entertain the claim of the Government in advance of an administrative determination of the amount justly due upon the termination of the contract, we think is not logically tenable. In the proof of claim it was asserted that the Contractor had been paid in full "the total audited, approved and reimbursed cost under its contract at the date of the termination thereof." This was a sufficient allegation that an administrative determination of the rights of the Contractor had been made and that the Contractor had been paid in full prior to the filing of the Government's claim. The Government was, in our opinion, entitled to have its claim against the Contractor judicially determined.

Article 16 of the contract provided that "all disputes concerning questions of fact arising" under the contract were to be decided by the Contracting Officer, subject to written appeal by the Contractor to the head of the department concerned or his duly authorized representative, whose decision was to be final and conclusive on the parties. The Article concludes with this sentence: "In the meantime the Contractor shall diligently proceed with performance." Obviously, we think, this Article provided for nothing more than an administrative determination of questions of fact which might arise during the course of the performance of the contract and prior to its termination.

█ That the Government based its claim for its loss resulting from the breach of the contract upon a wrong measure of damages, could not justify the dismissal of its claim. In re International Match Corporation, 2 Cir., 69 F.2d 73, 74–75. There is no reason to apprehend that the claim of the Govern-

ment will be allowed for a greater amount than is actually due it.

The Contractor was, of course, obligated, by the express terms of the contract and by law, to return to the Government the unexpended balance of the special fund created by the Government's advances, and we see no distinction between this item of the Government's claim and other items relative to funds paid to the Contractor by the Government to which the Contractor was not entitled or was not entitled to retain.

■ This was not the kind of a controversy which properly could be terminated by dismissing the Government's claim. Complicated and doubtful issues of fact and law can seldom be satisfactorily determined by dismissing a pleading for insufficiency of statement. See and compare, Publicity Building Realty Corporation v. Hannegan, 8 Cir., 139 F.2d 583, 586–587; Kingwood Oil Co. v. Bell, 7 Cir., 204 F.2d 8, 13. The issues raised by the Government's claim and the objections of the trustee should have been determined after a trial and after affording each of the parties a full opportunity to introduce any and all evidence which had any bearing on those issues.

■ We direct attention to the fact that "It has long been established that 'courts of bankruptcy are essentially courts of equity, and their proceedings inherently proceedings in equity.' Local Loan Co. v. Hunt, 292 U.S. 234, 240, 54 S.Ct. 695, 697, 78 L.Ed. 1230; Pepper v. Litton, 308 U.S. 295, 304, 60 S.Ct. 238, 244, 84 L.Ed. 281." United States National Bank v. Chase National Bank, 331 U.S. 28, 36, 67 S.Ct. 1041, 1045, 91 L.Ed. 1320.

■ The equitable powers of bankruptcy courts "have been invoked to the end that fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done." These equitable powers are to be exercised with respect to claims. Pepper v. Litton, 308 U.S. 295, 304–305, 60 S.Ct. 238, 244, 84 L.Ed. 281.

■ Proceedings for the enforcement of claims are the same in reorganizations under Chapter X of the Bankruptcy Act as in ordinary bankruptcy proceedings, and the jurisdiction of the reorganization court is that which bankruptcy courts have ordinarily possessed. Meyer v. Fleming, 327 U.S. 161, 164, 66 S.Ct. 382, 90 L.Ed. 595. Claims in bankruptcy need not be pleaded with technical accuracy. In re International Match Corporation, supra, 69 F.2d 73, 74–75; Durrance v. Collier, 5 Cir., 81 F.2d 4, 8. If the facts alleged in a claim show an unjust enrichment of the bankrupt, the claim is provable, even though the claimant has asked for an excessive amount. In re International Match Corporation, supra, page 75 of 69 F.2d. Order 37 of the General Orders in Bankruptcy, Title 11 U.S.C.A. following § 53, makes the Federal Rules of Civil Procedure, 28 U. S.C.A., in so far as they are not inconsistent with the Bankruptcy Act or the General Orders, applicable to proceedings under the Act.

Our conclusion is that the Government has stated a claim which entitles it to a trial on the merits of the issues tendered by its claim, and to amend or supplement that claim if so advised.

The order appealed from is reversed, and the case is remanded with directions to reinstate the Government's claim and for further proceedings not inconsistent with this opinion.