E. I. DU PONT DE NEMOURS & COM-
PANY, and UNITED STATES of
America, Appellants,

v.

LYLES & LANG CONSTRUCTION
COMPANY, Appellee.

No. 6852.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 18, 1954.

Decided Feb. 2, 1955.

**330**

James L. Morrisson, Attorney, U. S. Atomic Energy Commission, Washington, D. C. (Warren E. Burger, Asst. Atty. Gen., Washington, D. C., N. Welch Morrisette, U. S. Atty., Columbia, S. C., Paul A. Sweeney and Morton Liftin, Attorneys, Department of Justice, Washington, D. C., and William Mitchell, Gen. Counsel, U. S. Atomic Energy Commission, Winston Salem, N. C., on brief), for appellants.

James F. Dreher, Columbia, S. C. (David W. Robinson, and Robinson, Robinson & Dreher, Columbia, S. C., on brief), for appellee.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

PARKER, Chief Judge.

This is an appeal from a judgment for plaintiff in an action to recover agreed compensation under the terms of a contract and damages for an alleged breach. The contract was one entered into by the plaintiff, Lyles & Lang Construction Company, as a subcontractor, with the defendant, E. I. du Pont de Nemours & Company, the holder of a contract with the United States Atomic Energy Commission for the construction of the Savannah River project. Under the contract sued on plaintiff agreed with defendant to construct 75 dormitory buildings to house 7,500 workers on the project, and defendant agreed that it would guarantee 100% occupancy of the buildings so constructed at an agreed rental rate for a period of two years after completion and acceptance, with provision that defendant might terminate the contract upon payment of certain stipulated amounts if after the first year of occupancy or upon a cost plus basis if prior to the end of the first year. The contract was terminated before the end of the first year of occupancy and before the commencement of construction at one of the sites where 30 of the dormitory buildings were to be constructed. The action was to recover compensation on the cost plus basis provided by the contract with damages for breach as to the 30 buildings which had not been constructed.

The defendant filed answer and counterclaim in which it joined issue with plaintiff on the allegations of the complaint, denied all liability under the contract on the ground that plaintiff had entered into a joint venture agreement in violation of its provisions, pleaded the disputes clause of the contract in bar of the right to maintain the action and, by way of counterclaim, asked recovery of the full amount of $1,900,832.17 theretofore paid plaintiff or, in the alternative, the amount by which plaintiff had been

overpaid on account of the termination of the contract, this amount to be determined by audit. Plaintiff filed reply to the answer and counterclaim denying that the joint venture was a violation of the contract or that defendant was entitled to recover anything under its counterclaim, at the same time filing a motion to strike the defense based on the disputes clause. Subsequently defendant moved for judgment on the pleadings and a month or so later moved to eliminate from the trial of the case all issues of fact. Defendant moved subsequently that the United States be substituted for defendant as a party in the case and, when this was denied, that the United States be brought in as an additional party.

The trial judge denied the motion to make the United States a party and held that neither the joint venture agreement nor the disputes clause in the contract barred the plaintiff of the right to maintain the action. The case was then heard before the judge without a jury, a full hearing was had on all the issues involved and the judge held that plaintiff was entitled to recover under the contract the costs incurred in the construction of the buildings accepted for occupancy, together with the 20% provided by the contract for profit and overhead, less the value of the land, the salvage of the buildings and rental accruals prior to termination. In costs and not overhead he included items such as architects', and engineering fees, legal costs and interest charges applying to the project as a whole and not individual buildings, and refused to exclude items representing services rendered by corporations controlled by persons interested in the joint venture. He held, also, that there was no right to terminate the contract with re-

spect to the buildings which had not been constructed and accepted and that the attempted termination with respect to these constituted a breach of contract for which plaintiff was entitled to recover the profit that would have been realized if they had been constructed and accepted. He allowed interest at the legal rate of 7% on all items, beginning as to each item thirty days after notice of termination of the contract with respect to the site to which it related.[1] He found the facts in a comprehensive opinion which dealt fully with all matters in dispute. Those relating to the questions raised on this appeal will be stated at greater length in the sections of the opinion dealing with those questions.

Eight questions are raised by the appeal, viz.: (1) Was there error in refusing to make the United States a party to the action? (2) Was there error in holding that plaintiff was not barred by the disputes clause of the contract from maintaining the action? (3) Was there error in holding that plaintiff was not barred from maintaining the action by reason of the joint venture agreement? (4) Was there error in including as costs the charges for services rendered by corporations controlled by persons who were parties to the joint venture agreement or services rendered by such persons themselves? (5) Was there error in applying the 20% allowed by the contract for overhead and profit to the gross costs of construction before the deduction for land, salvage and rent accruals? (6) Was there error in including in cost such items as engineering and architectural and legal fees, which applied to the project as a whole and not to individual buildings? (7) Was there error in holding that there was no right of termination with respect to buildings not

---

1. Although the contract provided generally for the construction of 75 buildings without providing where any of them were to be built, the parties later agreed that 15 buildings each should be built on sites at Allendale, Williston and Barnwell and 30 at Beech Island. The buildings at Beech Island were never constructed.

The others were constructed and accepted for occupancy, but the contract as to them was terminated prior to twelve months following the date of occupancy. The notices of termination were given upon different dates as to each of the sites.

constructed and accepted for occupancy and awarding damages for breach of contract with respect to such buildings? And (8) Was there error in awarding interest at the legal rate prior to judgment? With respect to the first six questions, we think that the action of the lower court was correct and should be sustained. We think there was error in holding that there was no right to terminate the contract as to the buildings not constructed and in awarding damages for breach of contract with respect thereto. As to the award of interest we think that interest should be allowed prior to judgment but not necessarily at the legal rate. We shall discuss the questions stated in tne order hertofore set forth.

### 1. The Question of Joinder.

■■ The contract between defendant and the United States acting through the Atomic Energy Commission provided that the government would indemnify and hold the defendant harmless against all expense, loss or damage arising out of or connected with the work to be done thereunder, and would assume and carry on the defense of all "claims, suits or legal proceedings" asserted or instituted against the defendant on account of acts or omissions in the performance of the work, and would pay and discharge all final judgments obtained against the defendant in such litigation. Under this provision, attorneys of the Department of Justice handled this litigation for the defendant from its inception. A provision of the contract between plaintiff and defendant provided that that contract might be assigned by defendant to the United States; and on July 3, 1953, after all pleadings had been filed and the cause had been at issue for several months and a number of hearings had been held, counsel for the government representing the defendant caused an assignment of the contract to be made to the United States and moved under Rule 25(c) of the Federal Rules of Civil Procedure, 28 U.S.C., that the United States be substituted for the du Pont Company as party defendant. This motion was denied, as was a motion then made that the United States be allowed to intervene. At the opening of the trial a motion was made to dismiss the action on the ground that du Pont no longer had any liability under the contract.

We think that all of these motions were properly denied. The contract of plaintiff was with defendant, not with the United States, and defendant in making it was acting as an independent contractor, not as an agent of the government. Cf. Carson v. Roane-Anderson Company, 342 U.S. 232, 236, 72 S.Ct. 257, 96 L.Ed. 257; Continental Illinois Nat. Bank & Trust Co. of Chicago v. United States, Ct. Claims, 81 F.Supp. 596, 112 Ct.Cl. 563. Before the assignment had been made the contract had been terminated by the defendant, plaintiff's right to recover under its provisions had become fixed, suit had been instituted for recovery, hearings had been held and the case was ready for trial. Substitution of the United States as a defendant might well have ousted the court of jurisdiction, since the amount sued for was greater than allowed by the Tucker Act, 28 U.S.C. § 1346; and, although defendant denies that there was any intent to affect jurisdiction, it is well settled that the parties could not by consent confer jurisdiction on the court. Under such circumstances, the court was acting well within the limits of the sound discretion contemplated by Rule 25(c) in refusing to allow the substitution asked.

■ We think, also, that the court was acting well within the limits of the sound discretion reposed by Rule 24(b) in refusing to allow intervention by the United States. Assuming that such intervention would not have affected the court's jurisdiction, there was manifestly no need for it. There is no reason to think that the attorneys of the Department of Justice representing the defendant would have acted differently or that the results in the case would have been in any respect different, if the United States had been made a party of record. There was, of course, no right to inter-

vene as of right under Rule 24(a). Not only was the application not timely but there was no reason to think that the representation of the interest of the United States by defendant, represented by attorneys of the Department of Justice, was or might be inadequate.

### 2. *The Disputes Clause.*

 The disputes clause of the contract upon which defendant relies is section 11, which is as follows:

"Section 11. Disputes. Except as otherwise specifically provided in this Agreement, all disputes concerning questions of fact arising under this Agreement shall be decided by the Manager of the Commission's Savannah River Operations Office subject to written appeal by the Operator within thirty (30) days to the Commission, whose decision or that of its duly authorized representative shall be final and conclusive upon the parties hereto. In the meantime the Operator shall diligently proceed with the work as directed. Appeals to the Commission under this Section shall be submitted through du Pont."

Defendant has never asked that any dispute of fact be referred under this section of the contract, but has merely pleaded same in bar of plaintiff's right to recover in an answer in which all liability under the contract is denied and a counterclaim for recovery of moneys paid plaintiff is asserted, and has later asked in a motion that the issues be so limited as to exclude all issues of fact from the trial of the case on the basis of the disputes clause, without suggesting that such issues be referred under that clause or that proceedings be stayed pending the reference. We think it clear that the trial judge correctly refused to hold the action barred for failure to proceed under the clause or to limit the issues in the case by excluding all issues of fact.

In the first place, we do not think that the disputes clause has any application to a case such as this. The contract was not one under which plaintiff was constructing buildings for defendant, as in an ordinary construction contract, but one under which it was constructing buildings for itself to be owned and rented by itself. The defendant was interested that they be constructed so that the personnel working on the Savannah River project could be housed and it accordingly guaranteed a rental to plaintiff for a two year period as an inducement to construction, with an agreement that the period might be extended to three years at defendant's request but with a further provision that at the end of the period they be torn down and removed so as not to result in the creation of slum conditions. The defendant reserved the right to terminate the contract at any time as to any building or buildings, agreeing upon certain lump sum payments if terminated during the second year of occupancy and to reimburse plaintiff for costs plus 20% for overhead and profits, with certain deductions, if terminated prior to the expiration of the first year of occupancy. The disputes clause was evidently intended to furnish a ready means of administrative settlement of questions arising during the performance of the contract which might delay or interfere with performance, not to provide for unilateral determination of the amount due under the contract upon its termination. United States v. Duggan, 8 Cir., 210 F.2d 926.

Furthermore, the questions involved in the litigation, as pointed out by the trial judge, were almost altogether questions of law and not disputes concerning questions of fact. They were questions as to whether under a proper interpretation there was a right to terminate the contract as to any building to be constructed under the contract prior to acceptance for occupancy, whether costs incurred on account of persons connected with the joint venture agreement were properly includible in costs, whether the 20% allowed for overhead and profits should be computed on gross costs or on the net after certain deductions, whether cer-

tain items were includible in overhead under a proper interpretation of the contract, etc. Even where disputes as to fact existed, they involved not pure questions of fact but mixed questions of law and fact, such as whether costs incurred for legal and engineering and architect's fees were to be determined on the basis of contracts made with respect thereto or on the basis of reasonable value, and, if so, what value was reasonable under the circumstances of the case. This clause of the contract, which had been drafted by defendant and which placed the settlement of fact disputes in the hands of the agency of the government which would be responsible for any losses thereunder, should manifestly be given a strict construction; and certainly it should not be interpreted to cover questions of the sort here involved. Cases upon which defendant relies such as United States v. Joseph A. Holpuch Co., 328 U.S. 234, 66 S.Ct. 1000, 90 L.Ed. 1192 and United States v. Wunderlich, 342 U.S. 98, 72 S.Ct. 154, 96 L.Ed. 113, are not in point, since the disputes there were disputes of fact arising in the performance of the contract; and it is worth noting that Congress by the Act of May 11, 1954, 68 Stat. 81, 41 U.S.C.A. §§ 321, 322, has modified the rule there approved, in so far as it applies to government contracts.

Even if it be considered that there are some disputes of fact in the case covered by the disputes clause, we think it clear that defendant has waived the right to rely on it. Not only has it not been invoked for the settlement of any disputes either before or after the institution of the litigation, but it appears also that in the course of negotiations as to the amounts due on account of termination the representative of defendant told the representative of plaintiff "that if Lyles & Lang did not feel they could settle within the bounds set forth, that they would have to resort to legal action"; and, after plaintiff had resorted to legal action, defendant filed answer under which it not only denied all liability under the contract but asserted a coun-

terclaim which would have required the court to adjudicate on its behalf the very matters which it denies that the court has jurisdiction to adjudicate on behalf of plaintiff. It is absurd for defendant to contend that plaintiff should be required to seek settlement under the disputes clause of a contract in the face of a denial by defendant that plaintiff has any rights whatever under the contract. It is equally absurd that defendant should ask the court to pass upon matters under its counterclaim and at the same time deny to the court the power to pass upon the same matters in connection with the claim of plaintiff.

The disputes clause is, of course, a limited agreement to arbitrate; and it is quite generally held that the right to rely upon an arbitration agreement contained in a contract is waived by denial of liability under the contract. The Atlanten, 252 U.S. 313, 40 S.Ct. 332, 64 L.Ed. 586; Jones v. Fox Film Corp., 5 Cir., 68 F.2d 116, 117; Home Ins. Co. v. Scott, 6 Cir., 46 F.2d 10, 13, reversed on other grounds 284 U.S. 177, 52 S.Ct. 72, 76 L.Ed. 229; Mitsubishi Shoji Kaisha, Ltd. v. Nicolau, D.C., 38 F.Supp. 156, 157; Wallace v. German-American Ins. Co., C.C., 41 F. 742; 3 Am.Jur. p. 887–888; 29 Am.Jur. p. 931; notes 15 L.R.A., N.S., 1055, 1073–1075; 117 A.L.R. 314; 3 A.L.R.2d 383, 400–417. It is also quite generally held that right to rely upon an arbitration agreement is waived by filing a counterclaim, which, without demanding arbitration, asks relief from the court with respect to matters embraced within the agreement. Radiator Specialty Co. v. Cannon Mills, Inc., 4 Cir., 97 F.2d 318, 117 A.L.R. 299; The Belize, D.C., 25 F.Supp. 663; notes 117 A.L.R. 301, 308–312.

No stay of Proceedings under the United States Arbitration Act, 9 U.S.C.A. § 3, was asked and we consequently need not consider whether such stay would have been warranted if applied for.

3. *The Joint Venture Agreement.*

Following the agreement between plaintiff and defendant and before the

formal contract had been executed, plaintiff, for the purpose of financing the construction of the buildings, planned to assign the contract to a partnership composed of its stockholders and two other persons who were to assist in the financing. The Atomic Energy Commission refused to approve the transfer and as the contract forbade the assignment without the consent of the Commission, plaintiff had to arrange other means of financing. This was done by a joint venture agreement on the part of those who would have composed the partnership. Under this agreement, it was provided that the plaintiff corporation go forward with the contract but that the profits therefrom be divided among the joint venturers who were to help finance it in certain proportions, and that they should control the policy and conduct of the business in accordance with their interest in the undertaking, but would indemnify the company for any loss which it might sustain in following their direction over its dissent. The defendant learned of this agreement sometime before the termination of the contract as to all of the buildings, and notwithstanding such knowledge continued to do business with plaintiff corporation, having it continue the business of renting the buildings, requiring it to remove them when the contract was terminated, giving it notice of the termination and paying large sums of money to it.

It is perfectly clear, we think, that the contract was not assigned to the joint venturers and that its performance was in no wise affected by the fact that this method of financing was adopted. It amounted to no more than giving those who financed the performance of the contract a share in the profits and a control over the actions of the corporation which they would not otherwise have had. Defendant was protected by the provisions of the contract, which were not modified in any way. There was no violation of the anti-assignment provision or any other matter of which defendant can complain; and defendant does not seem to have thought that there was any ground of complaint on this account until it was seized upon in an attempt to escape liability. The trial judge summed up the matter in the following language, which we think is amply sustained by the record, viz.:

"The instrument states that it is not intended to be an assignment of the du Pont contract and it appears on its face to be an agreement by the plaintiff to share profits which it might have in its hands at the completion of the contract (or the losses) with those persons who were contributing capital and credit toward its performance of the du Pont contract. Its primary purpose was to permit Mr. C. G. Fuller of Barnwell, S. C., who was not a stockholder in Lyles & Lang but who contributed $100,000 and credit to the plaintiff for use in the dormitory enterprise only, to share in the possible profits from the contract, and similarly to permit additional risk capital to be contributed by certain of the plaintiff's stockholders in the dormitory enterprise without having profits thereon taxed to both the corporation and the stockholders. Du Pont's representatives not only knew from the beginning that such a profit sharing arrangement was contemplated but they actually furthered it by assisting the plaintiff in efforts to obtain a bank loan to a proposed partnership to consist of the same parties that later comprised the Joint Venture.

"The Joint Venture Agreement does not purport to substitute for the plaintiff's obligations to the defendant the obligations of any other party. Certainly there was in fact no substitution of obligation. The contract with the defendant was completely performed by the plaintiff; none of the other Joint Venturers has sought to perform, interfered in any manner with the performance, claimed any interest under the contract, or made any claim against the defendant. I find that

the existence of the Joint Venture Agreement has not affected plaintiff's performance of the contract in any respect and that the defendant has not been prejudiced by it."

4. *Inclusion in Costs of Services Rendered by Corporations Controlled by the Joint Venturers.*

 The architectural and engineering services on the project were rendered by a corporation controlled by one of the joint venturers who was a stockholder in plaintiff. The supervisory services in the dormitories were rendered by another corporation controlled by another joint venturer and stockholder. Legal services were rendered by a law firm whose members were stockholders and joint venturers. Defendant contends that these charges should not be included in costs. The trial judge found with respect to all of them that they were regularly incurred in the performance of the contract, that they were necessary thereto, were reasonable in amount and were fixed by firm contracts. In such situation we see no reason why the services should not be compensated. They were unquestionably necessary to the project and the fact that they were rendered by persons connected with the enterprise is no reason that they should not be paid for. At the time the services were rendered and the contracts made under which they were to be compensated, there was no thought but that they would fall upon plaintiff; for no one anticipated a termination of the contract in advance of one year of occupancy, and only in that event would plaintiff be entitled to reimbursement for costs. In providing for reimbursement on such termination, the contract provided against reimbursement for the time and services only of Dan D. Lang and John T. Lyles, although defendant knew that there were other stockholders. While services rendered by stockholders and other interested persons to a contractor under a cost plus contract should be carefully scrutinized, we see no reason to disturb the findings of the trial judge with respect to those here involved, and concur in the portion of his opinion wherein he said:

"In all cost-plus contracts there is always a danger of the contractor padding his costs at the expense of the owner and thus increasing his own profit. Especially is this danger present when materials and services are furnished by a stockholder or other person affiliated with the contractor. I find such a possibility extremely remote in the present case because of the manner in which this contract developed. At the time of the making of the contracts for the services here, the plaintiff had no reason to believe that the defendant would ever be called upon to pay for the services or for any of the other costs. It had every reason to believe that the debts which it was incurring would remain solely its own obligations and it was therefore to its interest to keep them as low as possible. The testimony of both the plaintiff's and the defendant's witnesses is that there was never any actual thought that the dormitories would not be needed for at least a year. After the first year's operations the plaintiff's costs would become of no concern to anyone because the contract provided that on a termination after one year the plaintiff's reimbursement would be under a cancellation table which applied without reference to the plaintiff's costs. The du Pont representatives, during the negotiation of the contract and the early periods of its performance, made frequent representations to the plaintiff that many more bachelor accommodations than the 7,500 provided would be needed. The contract was originally for a two year term and it was at du Pont's insistence that the option for a third year was added. With such an optimistic atmosphere prevailing, it is hardly to be believed that the plaintiff would make contracts for services at excessive costs, and thus reduce its own profits, on the remote

possibility that the project might be terminated within a year and du Pont would have to pay the costs."

### 5. *The 20% Allowance for Overhead and Profit.*

Section 3 of the contract provides for its termination. Subsection (a) relates to termination for cause and admittedly has no application. Subsection (b) provides for termination for convenience of the Commission, and, because of its importance to the question here under discussion and to the question as to breach discussed hereafter, we quote it at length as follows:

"(b) Termination for Convenience of Commission. This Agreement or any part thereof may be terminated by du Pont subject to the approval of the Commission, for the convenience of the Commission. Any such termination shall be effective upon thirty (30) days' written notice by du Pont to the Operator setting forth the extent to which performance under this Agreement is to be terminated and the date upon which such termination becomes effective, in which case du Pont will pay the Operator a Lump Sum to be determined in accordance with the following table on the basis of the number of buildings ready for occupancy on the date of termination. By payment of such amount or amounts, du Pont will thenceforth be relieved of any further obligations under this Agreement, with respect to the building or buildings terminated."

(We omit here the lump sums guaranteed to be paid for termination during the second year of occupancy, beginning with $30,030 per building after 12 months of occupancy and decreasing at the rate of $2,502.50 per building per month during the succeeding 12 months period).

"In the event of termination of this Agreement on one or more of said dormitory buildings prior to twelve months following the date of occupancy of such building or buildings, du Pont shall pay the Operator a sum equal to the actual costs that have been incurred by the Operator in connection with such building or buildings plus twenty per cent (20%) of such actual costs for overhead and profit. Actual cost as used herein shall be defined as all out-of-pocket expenses that have been incurred by the Operator in connection with such building or buildings up to the date of termination, including, but not limited to, the acquisition of land, construction, furnishings, operation, and maintenance together with the net costs required to settle any outstanding obligations that may have been incurred up to the date of termination but not including any costs for personal time or services rendered by the principals of Lyles and Lang Construction Company (Operator) to wit: Dan D. Lang and John T. Lyles. This settlement will be subject to recognized audit procedures mutually satisfactory to both du Pont and the Operator and the mutually agreed value for the building or buildings, the value of land acquired and net rental accruals to date of termination will be deductible from the actual cost determination."

One of the questions raised by the appeal is whether the 20% allowed for overhead and profit on termination of the contract prior to twelve months following the date of occupancy should be computed on cost prior to the deduction of the value of land and buildings and rent accruals, as held by the judge below, or whether the computation should be made after these items have been deducted. With respect to this matter, we think that, in the light of the surrounding circumstances, there is ambiguity as to the proper meaning of the contract, and we agree with the judge below that the ambiguity should be resolved by applying the 20% before the deduction is

made for the deductible items. As he said in his opinion:

"I am unable to discern any logical purpose which would have led the parties to agree that the plaintiff would not be entitled to its profit and overhead upon that portion of its costs which might be offset by salvage and rental income. The obvious purpose of the deductions is to keep the contractor from being paid for something and then allowed to keep it. That purpose is accomplished by making the deductions from the total that it is to receive under the contract. To make the deductions and give the contractor its profit only on what might be left would have no business justification and could have the effect of causing the contractor a loss after satisfactory and economical performance on its part. Du Pont recognizes that this obviously unintended result was possible in its letter of December 19, 1952, to the Atomic Energy Commission (P's Ex. 44), which I shall refer to later. Certainly such a punitive interpretation of the contract should not be adopted if a fair interpretation is possible."

It must be remembered that, if things had developed as intended, plaintiff was not constructing the buildings for defendant but for itself. Defendant was not paying for them, but guaranteeing for a two year period, rentals amounting to $3,217,000 per year, with provision that at the end of the contract the buildings should be torn down. It was understood that, while plaintiff would be required to make large expenditures, defendant might not need the buildings for the term of the contract and for that reason provision was made for termination. If this should occur after the buildings had been rented for just a year, the plaintiff might keep everything received up to that time and would be paid in addition $30,030 per building or a total on the 75 buildings of $2,252,250. If the termination occurred before the end of the first year, plaintiff was to be reimbursed for its out of pocket costs incurred under the project with an allowance of 20% to cover overhead and profit. It was reasonable that against this cost plus overhead and profit the plaintiff should credit salvage and rentals received. It would not have been reasonable to require that these be credited against out of pocket costs before the addition of the 20%; for such requirement might result in denying to plaintiff the right to recover overhead expense on the project as well as any profit, and it is hardly possible that a provision fraught with such possible hardship to plaintiff should be made part of a termination provision inserted for the benefit and convenience of the defendant.

██ In a proposal of August 28, 1951, plaintiff used language supporting defendant's interpretation of the contract, but this was in conflict with the terms of a prior proposal. Defendant realized that this conflict existed and in its letter of August 28, awarding the contract to plaintiff, conditioned the award upon plaintiff's supplementing its proposal by letter, which should contain among other things: "2. further definition of cost to which the 20% applies, on the portion regarding termination during the first twelve (12) months of operation." On August 29, plaintiff, in response to this letter of August 28, wrote a letter covering this matter and suggesting the language for section 3(b) of the contract which stated clearly that the 20% was to be applied before and not after the deductions which were provided for. Defendant made no objection to the language so proposed and when the formal contract was submitted and signed some months later, the representative of plaintiff was told by the representative of defendant that the language therein employed had the same meaning as that proposed by plaintiff. All of these matters were properly considered as bearing upon the proper interpretation of the contract. Progressive Furniture Co. v.

Stoneville Furniture Co., 4 Cir., 192 F. 2d 869.

Another matter which throws light on the interpretation placed on the contract by the parties is a letter of December 19, 1952, by the Assistant Manager of defendant to the Manager of the Savannah River Operations Office of the Atomic Energy Commission, in which he used the following language:

> "The basic agreement between du Pont and Lyles and Lang provides that Lyles and Lang will construct and operate the defined facilities at their expense and that du Pont in turn guarantees income for a specified period of time. It was further the intent of the parties that in the event of cancellation for convenience Lyles and Lang would recover all of their costs plus a profit.

> "In an effort to avoid the nuisance and expense of salvage proceedings in the event of a cancellation for convenience the wording of Section 3 was unfortunately and unintentionally constructed in such a manner that it could be interpreted that the 20% representing overhead and profit be applied at the net level.

> "Application of such an interpretation to actual costs as reflected in the attached tabulation would result in little or no profit to the operator. We cannot support such a position as reflecting the intention of the contracting parties. It should be noted that the attached tabulation does not include Barnwell costs.

> "Regardless of legal or accounting opinions that may attempt to define the intent of the parties, those of us who participated in the negotiations must state that the principles outlined in this letter represent the proper understanding between the parties and our computation represents the approximate minimum payment to Lyles and Lang that we could conscientiously defend in legal action."

Attached to this letter was a statement showing the deduction of $102,500 for land and buildings before but the deduction of $799,263.88 income from rent *after* the computation of the 20%. The important deduction, of course, is that of income from rent; but it is clear from the contract that the deduction of land and buildings falls in the same category.

6. *Are Costs Attributable to More Than One Building Chargeable as Costs Under the Contract or Must They be Eliminated as Overhead?*

The contention of defendant is that costs attributable to the entire enterprise, such as legal fees, interest on borrowed money, architect's and engineering fees, auditors' fees, etc., should be excluded from the computation of cost under the contract and absorbed as overhead by plaintiff. We think this a strained and unnatural construction; for we can see no reason why items which would be treated as cost under a contract for constructing a single building should not be so treated under a contract for constructing 75 buildings. They were so treated by the defendant when it was agreed at a conference on March 6, 1952, that only the costs incurred by plaintiff at its Leesburg Road or Home Office, i. e. costs applicable to its general business, should be treated as overhead which plaintiff was to absorb under the contract. Shortly after this conference, plaintiff began sending invoices to defendant for its costs at the Beech Island project which had been terminated, included in which were a proportionate part of the costs now challenged as overhead, and defendant paid them in the total amount of $58,000. Defendant's contract supervisor and accounting department approved the payment. It was later recouped by deduction from a rental check, but this was not on the ground that the items constituted overhead but that they were not properly supported.

A circumstance showing that the items here under consideration were not to be

treated as overhead was a supplemental agreement of December 6, 1951, amending the provision relating to termination for cause and providing that in the event of such termination, architectural, engineering or legal fees should be excluded from out of pocket costs. There would have been no reason for such a provision if, without it, such fees were to be treated as overhead under the contract.

The trial judge went to the heart of the question presented in the passage of his opinion in which he said:

"The defendant concedes that general labor and material costs may properly be allocated among several structures. There is no reason why a similar allocation cannot be made of an architect's fee when the services were rendered, presumably equally, on a number of identical buildings under one contract. Actually, there is no need for any allocation here between buildings or between sites. To use the accountant's term, we have one 'product' here and that is the construction and operation of the entire group of dormitories. Any charge which goes into any one of the dormitories goes into the group and when the entire group has been terminated, any charge which went into any one of the dormitories is reimbursable."

As said by Judge Hamilton in Grand Truck Western Ry. Co. v. H. W. Nelson Co., 6 Cir., 116 F.2d 823, 839, certiorari denied 297 U.S. 717, 56 S.Ct. 592, 80 L. Ed. 1002: "These (overhead expenses) are not definable with precision but may be said to include broadly the continuous expenses of the business, irrespective of the outlay on a particular contract." See also Glenn L. Martin Co. v. United States, 4 Cir., 100 F.2d 793, reversed 308 U.S. 62, 60 S.Ct. 32, 84 L.Ed. 82; Sammons v. Colonial Press, 1 Cir., 126 F.2d 341, 350; Alfred Bell & Co., Ltd., v. Catalda Fine Arts, Inc., D.C., 86 F.Supp. 399, 415, modified and affirmed 2 Cir., 191 F.2d 99.

### 7. *Breach or Termination of Contract.*

▇▇ The learned trial judge was of opinion that termination of the contract as to any building was not authorized under the contract until the building had been completed and accepted for occupancy. In this we think there was error. Under the language heretofore quoted there could be termination of the contract for the convenience of the Commission, and there was no limitation upon the right to terminate except the requirement of 30 days' written notice. A lump sum guarantee was provided for termination after 12 months occupancy and a cost plus basis of compensation was provided "in the event of termination * * prior to twelve months following the date of occupancy", but nowhere was there any provision requiring that a building be completed and accepted for occupancy before the right to terminate would arise and we think it unreasonable to place any such interpretation upon the contract. The right of termination was inserted to protect against the burdensome guarantee in the event it should develop that the buildings were not needed; and if this appeared before construction or acceptance there was every reason why the cost of construction should be avoided or minimized by terminating the plaintiff's obligation to construct. No useful purpose could be served by requiring the construction of a building which was not needed—by requiring plaintiff to incur additional costs of construction in order that defendant might be required to pay additional amounts under its guaranty. A case directly in point, we think, is the recent decision of this court in Reconstruction Finance Corp. v. Sherwood Distilling Co., 4 Cir., 200 F.2d 672, 675, where the court, speaking through Judge Dobie, said:

"The District Judge also stressed the clauses in the contract giving Sherwood the right of purchase and then stated 'We believe that when these provisions are read in relation to the entire agreement, they contemplate the giving of the options

only upon the plant as a completed structure.' With this interpretation of the termination clause of the contract, even when read in the light of the entire contract, we cannot agree. This termination clause is absolute and unconditional on its face. We find nothing in the other clauses of the contract which would justify us in *adding* to the termination a *new* limitation that the right to terminate (by either party) could be exercised *only after the completion of the project*. To say (as apparently the District Judge says) that immediately before the completion of the project neither party could terminate; but that, immediately after the project's completion, either party could terminate, seems to us a strained and unreasonable interpretation of the contract."

We think it just as unreasonable to say here that, although defendant could terminate the contract as to any building immediately upon its completion and acceptance, it could not exercise the right to terminate before that time but would have to allow the construction of a building which it knew that it would not use.

And we do not think that the notice of termination was void on the ground that 30 days' notice as required by the contract was not given. On February 7, 1952, plaintiff was duly notified to suspend operations at the Beech Island site. On March 5 a letter of termination was sent, terminating the contract as of March 7. The letter of February 7 served all the purposes of a letter of termination, in giving plaintiff notice not to incur further expense at Beech Island. If, however, it was not sufficient, the only effect of the insufficiency was to extend to April 4 the effective date of termination, and there is no evidence of any damage or inconvenience resulting from the delay. The plaintiff is entitled to recover with respect to Beech Island on the same basis as for termination at other sites, i. e. costs incurred plus 20% thereon for overhead and profits less the value of land and salvage of materials. As no buildings were completed and accepted for occupancy at the site there could be, of course, no deduction on account of rents.

## 8. *Interest.*

The trial judge allowed interest at the legal rate on the amount found to be due, commencing as to each site 30 days after the date of termination, on the theory that the claim of plaintiff was a liquidated claim within the meaning of the rule as applied by the South Carolina decisions cited in his opinion. We do not think, however, that the amount for which defendant was liable on the termination of the contract was either liquidated or determinable with sufficient certainty to bring it within the rule of these decisions. There was dispute as to whether some items were includible in costs under the contract, as to the proper amount of the items if includible, and as to whether the 20% override was applicable before or after deductions. Litigation was just as necessary to determine the amount due under the contract as it would have been in the ordinary case to determine damages for breach. In this situation, we think that the rule applicable with respect to interest is that applied in computing damages for breach, i. e. that interest may be awarded by the trier of facts to compensate plaintiff for the loss sustained as the result of delay in receiving the amount to which he is held to be entitled. The subject was fully covered by this court in Railroad Credit Corporation v. Hawkins, 4 Cir., 80 F.2d 818, 825–826, certiorari denied 298 U.S. 667, 56 S.Ct. 750, 80 L.Ed. 1390, where we said:

"Interest is awarded in any case where it is not covered by express contract, because such award is necessary to place the injured party in the position which he would have occupied if the party in default had fulfilled his duty in the premises. As said by the Supreme Court in Miller v. Robertson, 266 U.S. 243, 257, 45 S.Ct. 73, 78, 69 L.Ed. 265:

'Compensation is a fundamental principle of damages, whether the action is in contract or in tort. Wicker v. Hoppock, 6 Wall. 94, 99, 18 L.Ed. 752. One who fails to perform his contract is justly bound to make good all damages that accrue naturally from the breach; and the other party is entitled to be put in as good a position pecuniarily as he would have been by performance of the contract. Curtis v. Innerarity, 6 How. 146, 154, 12 L.Ed. 380. One who has had the use of money owing to another justly may be required to pay interest from the time the payment should have been made. Both in law and in equity, interest is allowed on money due. Spalding v. Mason, 161 U.S. 375, 396, 16 S.Ct. 592, 40 L.Ed. 738.'

"For cases illustrating how the principle of awarding interest to afford adequate compensation for the withholding of money justly due has been applied under varying circumstances, see United States v. Creek Nation, 295 U.S. 103, 111, 55 S.Ct. 681, 79 L.Ed. 1331; Seaboard Air Line Ry. v. United States, 261 U.S. 299, 306, 43 S.Ct. 354, 67 L.Ed. 664; Brame v. Keystone Credit Corporation, 4 Cir., 76 F.2d 328, 331; Standard Accident Ins. Co. v. Simpson, 4 Cir., 64 F.2d 583, 589; New Amsterdam Casualty Co. v. United States Shipping Board, etc., 4 Cir., 16 F.2d 847, 852. And that the principle of awarding interest by way of affording adequate compensation where there has been default in the payment of money due is one of great antiquity, and recognized by the Roman Law. See Buckland Roman Law (2d Ed.) 551."

See also St. Paul Mercury Indemnity Co. v. United States, 10 Cir., 201 F.2d 57, 62, where the court, speaking through Judge Phillips, said:

"Even though the exact amount due was not determined until the amount of credits was arrived at, the court, in the exercise of its sound discretion, could award interest or its equivalent as an element of damages. In Concordia Ins. Co. of Milwaukee v. School District No. 98, 282 U.S. 545, 554, 51 S.Ct. 275, 278, 75 L.Ed. 528, the court said: ' * * * even in a case of unliquidated damages, "when necessary in order to arrive at fair compensation, the court in the exercise of a sound discretion may include interest or its equivalent as an element of damages." ' "

■ In as much as interest is awarded, however, as a means of arriving at the fair compensation to which plaintiff is entitled under the contract, the interest should be computed not at the legal rate fixed by statute but at the rate plaintiff would have had to pay upon a loan of a similar amount, considering the state of the money market and the rate charged by banks for the use of money. As we said in recent case of C. & O. R. Co. v. Elk Refining Co., 4 Cir., 186 F.2d 30, 35, 36 A.L.R.2d 329, which dealt with the inclusion of interest as an element of damages for the destruction of personal property:

"The reason underlying the award of damages for damage to or destruction of property is the same as that which applies in awarding damages or compensation in eminent domain cases, viz., to give the injured party full compensation for the loss that he has suffered; * * *. We do not think, however, that plaintiffs are entitled to the legal rate of interest provided by statute but merely such as will compensate them for the delay in recovering damages when consideration is given to the state of the money market at the time. We think that, under the circumstances here, they will be adequately compensated by an award of 3 per cent for the period prior to judgment."

Many matters were discussed in the opinion below, which it it not necessary to deal with here. It is sufficient to say that we approve the decision below ex-

cept with respect to the holding as to right of termination and breach at Beech Island and damages awarded on account of such breach and with respect to the rate of interest allowed. The judgment is accordingly affirmed except as to these matters but is reversed as to them and the case is remanded for further proceedings not inconsistent herewith.

Affirmed in part; reversed in part and remanded with directions.